MARY E. ROSS *vs.* PORTEOUS, MITCHELL & BRAUN COMPANY.

Cumberland.        Opinion, January 17, 1939.

*William B. Mahoney,*
*Theodore Gonya,* for plaintiff.
*Robinson & Richardson,*
*John D. Leddy,* for defendant.

SITTING: DUNN, C. J., STURGIS, BARNES, THAXTER, HUDSON, MAN-
SER, JJ.

STURGIS, J.   In this action on the case for breach of warranty
certified to the Law Court on report, the transcript of the evidence
shows that on or about September 24, 1937, the plaintiff visited
the defendant's department store and purchased from a clerk in the
feminine hygiene department one or more pairs of dress shields
used by women to protect their garments from armpit perspira-
tion. She asked for white "Kleinert's Onandoff No. Four" shields
and was told that they were not carrying that any longer in stock.
The clerk then showed her a shield saying that "this new kind, re-
cently marketed, was taking the place of that one (the shield asked
for) . . . . They had been chemically treated so that they could be
washed and ironed." In redirect examination, restating her conver-
sation with the clerk, the plaintiff said: "I asked for the same type
of shields I ordinarily wore, and was told that they were no longer
stocking them, but they had one very similar to it that *they con-
sidered better* and naturally I took their word for it and bought
it." In the following recross examination, she admitted that the
clerk's explanation of why the new shields were *better* than the old
style was "because they were boilable."

The shields purchased were marked and known to the trade as
"Kleinert's Onandoff No. Four, Blue Label" shields and except that
they were flesh colored and boilable were in all respects similar to
the white shields which she had worn. The flesh color came from the
use of rhodamine dye, an inert and harmless chemical. The new boil-
able quality was produced by introducing pure cotton flock into
the rubber lining. The Blue Label shields were made by the largest
manufacturer of dress shields in the country, had been on the
market for at least four years, and the annual sales of the product
ran into the millions.

Immediately after buying the shields, the plaintiff put them on
and wore them for about two hours when her armpits became irri-
tated and a removal of her clothing disclosed a highly inflamed
condition of her underarm and body in that region corresponding
in size and contour to the dress shield she had worn. The inflamma-
tion developed into dermatitis which responded slowly to treatment

and incapacitated the plaintiff for several weeks but finally subsided. The plaintiff again tried to use the Blue Label shields. In the latter part of October or first of November following her original purchase, she bought another pair at the defendant's store, attempted to wear them, and the results were the same. The record does not show that at the time of this second purchase the defendant's clerk made any statements whatsoever concerning the shields.

The plaintiff's family physician concedes that some people are susceptible to certain substances which the average person is not affected by, which is termed an allergy or idiosyncracy of the individual. And he says that a harmless substance applied to the skin of a person who has an allergy or idiosyncracy for it may produce inflammation and some individuals can not wear rubber next to their skin without having dermatitis due to the lack of evaporation of perspiration. Upon the hypothesis that the Blue Label shields involved in this action were free from deleterious substances, it was the physician's opinion that the plaintiff's dermatitis might be caused either by her allergy or the prevention of evaporation resulting from the use of the shields. Although he had not discovered in many years of professional attendance upon the plaintiff that she was allergic, he admitted that her actual condition in that regard could not be determined without an intradermal test which had not been made. The doctor also stated that, in seeking to determine the cause of the plaintiff's affliction, the extent of perspiration, lack of evaporation, heat and weather conditions, as also the tightness of the shield under the arm, were all factors to be considered. Although he attributes the plaintiff's injuries to the use of the Blue Label shields, he is unable to point out how or why that result came about.

A representative of the concern which manufactured the shields which the plaintiff purchased, and is its head chemist, explained at length the mechanical process used in making Blue Label dress shields, described the nature and amount of their chemical contents, their freedom from harmful or deleterious substances, and the rigid and repeated inspections to which they were subjected, and stated that all shields put upon the market were similar in every respect and no injury had ever been known to result from their use by the many women purchasing them throughout the country. No chemi-

cal analysis or other proof that the shields used by the plaintiff contained poisonous or harmful substances was introduced to contradict this evidence.

Such is the case reported. Obviously there was no express warranty made by the clerk who sold the shields. All that the plaintiff claims, when her testimony is carefully analyzed, is that when she asked for a white Kleinert shield she was told that they no longer stocked that but had one very similar to it "that they considered better." This, of course, was merely a matter of opinion and, at that, accompanied by an explanation that it was better because it was boilable. No expression of opinion merely, however strong, imports a warranty. R. S., Chap. 165, Sec. 12; *Bryant* v. *Crosby,* 40 Me., 9; *Rosenbush* v. *Learned,* 242 Mass., 297, 300, 136 N. E., 341; *Keenan* v. *Cherry & Webb,* 47 R. I., 125, 131 A., 309; 55 Corpus Juris 688 *et seq.* and cases cited.

The plaintiff claims, however, there is an implied warranty that the shields sold her should be reasonably fit for the purpose for which they were required under the Uniform Sales Act in force in Maine at the time of the sale as Clause 1 of Section 15, Chapter 165, R. S., which provides:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

We think the plaintiff's recovery in this action is governed by this clause of the act.

The weight of the evidence reported warrants the conclusion that the plaintiff, by implication, made known to the clerk in the defendant's feminine hygiene counter the particular purpose for which the dress shields she sought to purchase were required. It was made and adapted to one use and one use only. We can not assume that the clerk who waited on her was ignorant of this fact. *Weiner* v. *Schulte, Inc.,* 275 Mass., 379, 383, 176 N. E., 114; *Ireland* v. *Liggett Co.,* 243 Mass., 243, 137 N. E., 371; *Keenan* v. *Cherry & Webb,* supra; *Preist* v. *Last* (1903), 2 K. B., 148. That

the plaintiff relied on the clerk's skill or judgment is fully established. She so testified and neither fact nor circumstance contradicts her.

The plaintiff's right to recover on an implied warranty that the dress shields which she bought were reasonably fit for the particular purpose for which they were required as provided in Clause 1 of Section 15 of the Act can not be denied because the sale was "of a specified article under its patent or other trade name" where there is no implied warranty of its fitness for any particular purpose. Clause 4, Section 15, Chapter 165, R. S. It is well settled that it does not follow necessarily from the fact that an article purchased has a trade name that it is bought thereunder or that the buyer does not rely on the skill or judgment of the seller. Although here the plaintiff selected a brand of dress shields with which she was acquainted, she did not get it but accepted a different brand selected by the clerk. "The existence of an implied warranty 'is not negatived where the purchaser of an article, for a definite purpose rather than of a particular kind of merchandise, relies on the seller to supply him with something adapted to that end; the latter in that case does not escape liability by the recommendation and subsequent sale of an article having a trade name.' " *Weiner* v. *Schulte, Inc.*, supra, p. 383, 176 N. E., 116; *Ireland* v. *Liggett Co.*, supra, p. 247, 137 N. E., 371.

The implied warranty of the statute that goods sold for a known particular purpose "shall be reasonably fit for such purpose" (Clause 1, Section 15, Chapter 165, R. S.) measures the buyer's right of recovery and the seller's liability. It is accordingly held that in the sale of wearing apparel, if the article could be worn by any normal person without harm, and injury is suffered by the purchaser only because of a supersensitive skin, there is no breach of the implied warranty of reasonable fitness of the article for personal wear. *Flynn* v. *Bedell Co.*, 242 Mass., 450, 136 N. E., 252; *Bradt* v. *Hollaway*, 242 Mass., 446, 136 N. E., 254.

In the case at bar, the cause of the plaintiff's skin affliction on the evidence remains a matter of doubt and conjecture. It may be that she was allergic to the dress shield or one or more of its component parts, but that can not be known, her physician informs us, until an intradermal test is made. It is, of course, possible that the

shields contained deleterious and harmful chemicals or substances, but they were not analyzed and, if such be the fact, it has not been here established. We can not resort to a choice of possibilities. That is guesswork and not decision. *Titcomb* v. *Powers*, 108 Me., 347, 349, 80 A., 851 ; *Edwards* v. *Express Company*, 128 Me., 470, 148 A., 679 ; *Thibodeau* v. *Langlais*, 131 Me., 132, 159 A., 720.

The plaintiff, having failed to sustain the burden of proof of showing by competent evidence a breach of the implied warranty of fitness upon which she can only rely in this action, must be denied a recovery. The case will be remanded to the Superior Court where it originated for the entry of judgment for the defendant.

*So ordered.*