Argued June 15; reversed July 7, 1943

LANDERS *v.* SAFEWAY STORES, INC.

(139 P. (2d) 788)

· Before BAILEY, Chief Justice, and KELLY, LUSK and BRAND, Associate Justices.

*James Arthur Powers,* of Portland, for appellant.

No appearance for respondent.

120

■ BRAND, J. The motion to amend and the order allowing amendment were both made after the expiration of the ten-day period within which motions for new trial are to be made, but we are of the opinion that it was within the power of the court to allow the amendment. If further time was required for preparation by the defendant after the allowance of the amendment it was within the discretionary power of the court to grant such additional time. If the amended motion for a new trial was brought up for decision at a time so near to the expiration of the fifty-five days within which motions for a new trial must be decided, and if the court was of the opinion that the defendant could not be fairly required to prepare and present its case

within the remaining time, then the court could in the exercise of sound discretion deny the motion to amend and also deny the motion for a new trial by reason of the defects in the original motion.

■ The first assignment of error being without merit, we must now consider whether or not the court erred in giving the instructions which are criticized in the amended motion for a new trial, and if those instructions were erroneous, we must further determine in view of the entire record whether a new trial should have been granted. In this connection it must be observed that the respondent has neither filed nor sought to file any brief or offered any oral argument. Under these circumstances we are entitled to assume the statement of facts by the appellant to be correct.

> "In reaching our conclusion we have assumed the statement of facts by appellants to be correct. Where respondents fail to file a brief it is not incumbent upon us to search the record to ascertain the facts, although, in our discretion, we may do so if justice so demands." *Dix et al. v. Port of Port Orford,* 131 Or. 157, at p. 161, 282 P. 109.

■ Reference to the amended motion for a new trial will disclose that the plaintiff relied upon two alleged erroneous instructions as ground for setting aside the verdict of the jury. The court instructed that

> "* * * the law presumes that the defendant was not guilty of a breach of warranty."

Plaintiff contends that this instruction constituted prejudicial error. It was unnecessary for the court to invoke a rule concerning presumptions, but the other instructions made it clear that the court left it to the jury to determine on all the evidence whether there was or was not a breach of warranty. The jury could

122

not have been misled into thinking that the so-called presumption was conclusive or binding upon them. The burden of proof was upon the plaintiff to establish the alleged breach of warranty, and in view of that fact and the further fact that there is a disputable presumption that a person is innocent of crime or wrong (O. C. L. A. 2-407 (1)) we find no prejudicial error in the instruction as given.

 The second specification of error and the one upon which the court granted a new trial related to the instruction given by the court to the effect that

"* * * the fact that the plaintiff's hands may have become infected or burned is not evidence that it resulted from a breach of warranty by the defendant."

The court felt, and with some reason, that the foregoing instruction improperly took from the jury all consideration of the fact that plaintiff's hands were burned or infected after his use of the solution. If, instead of the language used, the court had instructed the jury that the mere fact *alone* that plaintiff's hands may have been burned would not be sufficient evidence that the burn resulted from a breach of warranty, the instruction would have been free from error. The complaint shows that the action in this case is based upon alleged breach of warranty and not upon negligence. Furthermore, the instrumentality which is claimed to have produced the injury was in the exclusive possession and control of plaintiff. The doctrine of res ipsa loquitur does not apply to such cases. *Oregon Auto-Dispatch v. Port. Cordage Co.*, (on rehearing) 51 Or. 583 at 587, 95 P. 598; *Dittert v. Fischer*, 148 Or. 366, 36 P. (2d) 592; *Naumann v. Wehle Brewing Co.*, 127 Conn. 44, 15 Atl. (2d) 181; *Poovey v. Inter-*

*national Feed Co.*, 191 N. C. 722, 133 S. E. 12. The mere occurrence of the injury did not raise a prima facie case of breach of warranty, and evidence of the purchase from defendant and use by the plaintiff followed by injury to plaintiff's hands would not alone be sufficient to support a verdict for plaintiff. If we were to assume that there was other substantial evidence of breach of warranty causing damage to plaintiff, then it would be clear that by advising the jury that the condition of plaintiff's hands was not evidence, the court would have committed error, but unless there was other evidence upon every material issue of plaintiff's case, we cannot agree that the instruction given could prejudice the plaintiff. Before affirming the order for a new trial we must first ascertain whether the jury could have found for the plaintiff under the evidence if there had been no erroneous instruction.

Plaintiff on September 14, 1940, bought from the defendant for nineteen cents a half gallon of bleaching solution, which was sold under the name of White Magic. Before making the purchase the plaintiff asked an employee of the defendant,

"* * * if it would take grass stains out of white cords and he said, 'Oh, yes, it will. That is a very fine product for bleaching, for that purpose.'"

This is the only evidence of any communication between buyer and seller at that time.

■ Distinctions have been drawn between implied warranty of merchantibility and implied warranty of fitness for a particular purpose (4 Williston on Contracts, Rev. Ed., § 989), but we are not here concerned with any such distinction. The pertinent provision of

our statute relative to implied warranties of quality is as follows:

"Where the buyer, expressly or by implication, makes known to the seller that particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill, or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonable [reasonably] fit for such purpose." O. C. L. A. 71-115 (1).

In the case at bar the particular purpose for which the goods were required and which was made known to the defendant was for bleaching clothes, which is also the general purpose for which the product was prepared and is commonly used. The communications between buyer and seller added nothing to the scope of the warranty implied by law, and since no particular purpose in any way different from the general purpose was made known to the defendant the warranty amounted merely to this that the goods were reasonably fit for bleaching purposes, that is, for the general purpose for which they were manufactured. 4 Williston on Contracts, Rev. Ed., § 989. In other words, there was an implied warranty of merchantibility and nothing more.

The label on the bottle gave the following directions for use:

"To remove stains more readily, first soak fabric in cold water 5 to 10 minutes; then soak 15 minutes in solution of 2 tablespoons WHITE MAGIC for each quart water; rinse thoroughly in clear water. If any trace of stain remains, repeat process. If ink stains leave brown spots, remove with vinegar or lemon juice."

The label also in larger letters at the top thereof reads: "NEVER USE FULL STRENGTH ON FABRICS."

Plaintiff testified that at the time he started to use the bleach his hands were all right. He read the directions and followed them. He used "about two gallons of water" and, "if I remember right, I put in about sixteen tablespoons full of this liquid." He swished the cords up and down in the solution, left them in about fifteen minutes and then wrung them out with his hands, rinsed them in cold water, put them in the washing machine and washed them. We quote further from the testimony:

"Q In doing this did you get any of the solution on your hands?

"A Well, the whole solution, yes. I rung the trousers out of that solution.

"Q When did you first notice anything wrong with your hands after that?

"A Well, it was when I was finishing washing. I do the washing at our house, and when I was finishing the washing my fingers felt—in between the fingers on both hands they [felt] hot and dry, and I washed them a couple of times, wet them; I thought that was funny, but I kept on and when I got through I went upstairs and told my wife, 'My fingers feel so dry,' and that night they got very raw."

During the next few days a serious condition developed in his hands which ultimately required his hospitalization. The plaintiff's testimony discloses further that he had used another bottle of bleaching fluid concerning which he testified:

"Q When did you use that up?

"A Oh, just prior to that; I don't know whether it was the day before or not. We just ran out."

There is no evidence in the record as to the character of the bottle last referred to, how he diluted its

contents if at all or how he used it. Nor is there any evidence as to what, if any, substance was used in connection with the doing of the washing immediately after he had bleached the cords. Nor do we find in the record any evidence as to whether or not any of the White Magic in its full strength came in contact with his hands when he was preparing the diluted solution in accordance with the instructions on the label. The plaintiff's case is not improved by the testimony of his expert witness, Dr. Bendshadler. The doctor testified that he did not know what caused the injuries to the plaintiff's hands, though he did express the opinion that the condition of plaintiff's hands did not present a picture of allergy. He then testified that in his own experience with these fluids,

"* * * they aren't too good, any of them. I don't think there is a doctor in the City of Portland in general practice that won't have many cases in which he has burns of those fluids. I don't think they should be out to the public, personally, I don't."

This testimony was stricken on motion of the defense and without objection by plaintiff. The witness also volunteered the following testimony which was also stricken as unresponsive to any question:

"I have had numerous cases of people who have treated athlete's foot; they have put their feet in a solution used as an antiseptic. If you could see some of their feet you would see beyond any doubt this is a dangerous product to have on the market for people to use."

Neither answer was responsive to the question asked, and furthermore the substance of his testimony was not relevant to the issues in the case at bar. The question is whether the preparation was reasonably fit for its intended use when employed in accordance

with the directions, namely, in a highly diluted solution. The doctor's testimony gave no indication of the strength of the solution used in the treatment of athlete's foot, nor are we concerned with its employment in any strength as an antiseptic treatment of pre-existing infected conditions. Furthermore, there is no evidence in the doctor's testimony that any of the persons who had used bleaching fluid for antiseptic purposes had employed defendant's product, White Magic.

We turn to the testimony presented by the defense. Substantial, credible and uncontradicted evidence was submitted by experts concerning the inherent quality of White Magic and other similar bleaching fluids. That testimony discloses that when used in solutions in accordance with the instructions on the label the fluid is harmless. White Magic is one of a number of bleaching solutions in general use. Other similar products, some of which are nationally advertised, are Clorox, Purex, and Dandee. All of them contain the same amount of sodium hypochlorite, namely, 5.25%. The balance, to-wit, 94.75% of the contents of the bottles as sold consists of inert ingredients, ordinarily water. Sodium hypochlorite is a salt, a bleaching agent whose properties are due to the clorine that is in the chemical salt. It breaks down to give off oxygen and chlorine, and when this breaks down it acts as an oxidizing agent, the result being that in proper solutions it will clean spots on articles of clothing. If put upon the hands at full strength as it comes from the bottle any of these cleaning fluids might cause a chemical burn, although it is frequently used full strength without such results.

Dr. Beeman, instructor in pathology and toxicology at the University of Oregon Medical School, testified as follows:

"Q Well, doctor, can you state definitely, in your opinion, that such a solution would not cause a chemical burn?

"A Diluted two tablespoons full to the quart it would be my opinion that there would be no chemical burn from that solution; that you could actually drink the stuff if you wanted to."

He further testified that there was a drug used in treating dirty wounds which was made up of the same chemical which is contained in White Magic and which drug is used in a strength about five times stronger than White Magic. Defendant's testimony also showed that after the plaintiff's injury the contents of the identical bottle sold to the plaintiff was analyzed and that the percentage of sodium hypochlorite was found to be exactly 5.25% as indicated on the label.

Witness Charlton, the operator of a chemical laboratory, engaged in the analysis of a great variety of food and drug articles, testified, without any contradiction, as follows:

"Q And is that content you have described there, is that injurious for use to the public generally if used as provided for on the label, which would be two tablespoons to a quart of water?

"A I should say it would be perfectly safe to use. The Government regulation with regard to the concentration of these solutions is that they must not be over ten per cent sodium hypochlorite. If they are, they must be labeled 'Poison' or 'Injurious'. But this concentration must be regarded as relatively low; otherwise there would be some regulation regarding the label."

He also testified that when diluted in accordance with the directions on the label, the fluid could be used as a mouth gargle, and he offered so to use it in the presence of the jury. He testified further:

"A I might say that I have had a good deal of experience with hypochlorite solutions, both chemical and bacteriological studies, and their use in different kinds of sanitation and sterilizing procedures. They are used in dairy plants, poultry yards, and around beer parlors in cleaning, and so on, and so forth, and I have had a lot of contact with the solution. As far as the particular concentration of two tablespoons full per quart, I won't say that I have had any experience with just that amount, but I have used these solutions a great deal and they are considered to be harmless solutions. All the dairy plants use sodium hypochlorite for sterilizing their equipment, and they are generally not regarded to be injurious to food or touch.

"Q In the beer parlors is that the solution they use for washing the glasses?

"A Yes, one of the city health ordinances requires that those glasses must be washed in a solution not quite as strong as is required here, but the point I am trying to get at is that these solutions in this strength are handled daily by great numbers of people in the home and in the food manufacturing plants and are not generally considered to be injurious."

All of this direct testimony to the effect that the product was harmless if used in accordance with directions was wholly undisputed unless it be said that the mere fact alone that the plaintiff used the product and that thereafter his hands became infected is to be deemed substantial contradictory evidence. We think it should not be so considered.

We turn to the authorities. There was sufficient evidence of an implied warranty of fitness for cleaning purposes, but the extent thereof still remains to be determined. Such a warranty does not constitute an agreement that the goods can be used with absolute safety or are perfectly adapted to the intended use but only that they shall be reasonably fit therefor. Such warranty must be reasonably construed in the light of common knowledge with reference to the nature of the article sold. *Cavanagh v. F. W. Woolworth Co.*, 308 Mass. 423, 32 N. E. (2d) 256. Nor can one recover for breach of implied warranty of fitness if he suffers harm by reason of the improper use of the article warranted. See *Fredendall v. Abraham & Straus, Inc.*, 279 N. Y. 146, 18 N. E. (2d) 11.

*Poovey v. International Sugar Feed Co.*, supra, bears a striking resemblance to the case at bar. Plaintiff purchased cattle feed from the defendant company and fed it to his cattle, two of which subsequently died. A veterinary surgeon diagnosed the cause of death as ptomaine poisoning. There was no direct testimony that the feed purchased of the defendant was the cause of the poisoning. There was evidence tending to show that others in the neighborhood had purchased some of the feed and that their cows had also become sick. It also disclosed that others had fed the same feed to their cattle with no injurious results. As in the case at bar an expert official made a physical examination of the product and subjected it to chemical analysis, which showed that there was no poisonous or deleterious matter in it. There was a verdict for the plaintiff. Upon appeal the court held first that there was an implied warranty that the feed was reasonably fit for the purpose of the parties, but it was also held that there was not sufficient evidence

of a breach of implied warranty to justify submission of the case to the jury. There was evidence that plaintiff had also fed to the cattle "some wheat straw and some roughness." The court said:

"The conclusion from the testimony is irresistible that the only evidence of a breach of warranty was the fact that after feeding the product for ten days or more two of plaintiff's cows died from what was diagnosed as ptomaine' poisoning. No analysis of the stomach of the dead cows was made, and it appears from the record that the particular cows that died were also fed with 'wheat straw and roughness.' The mere sickness and death of the cows is not sufficient evidence in itself to establish a prima facie case of breach of warranty. The doctrine of 'res ipsa liquitur' does not apply to a breach of warranty. Oregon Auto-Dispatch v. Portland Cordage Co., 51 Or. 583, 94 P. 36, 95 P. 499." *Poovey v. International Sugar Feed Co.,* supra, 133 S. E. at p. 14.

In the case of *Ross v. Porteous, Mitchell & Braun Co.,* 136 Me. 118, 3 Atl. (2d) 650, the plaintiff purchased from the defendant a dress shield. It was held that there was an implied warranty of fitness. The plaintiff wore the shield about two hours, and her armpits became irritated and inflamed. Dermatitis later developed. The testimony of a physician was to the effect that a harmless substance may produce inflammation when applied to the skin of a person who has an allergy or an idiosyncracy for it. The physician indicated that dermatitis might be caused either by allergy or the prevention of evaporation caused by the use of the shield or by some deleterious substance in the shield. No test for allergy was made, and he admitted that her condition in that regard could not be determined without such test. He attrib-

uted plaintiff's condition to the use of the shield, but he was unable to tell how or why that result came about. As in the case at bar there was expert testimony by a chemist to the effect that the shields were free from deleterious substances, and there was no testimony on behalf of the plaintiff by chemical analysis or otherwise to contradict the defendant's evidence. The court held that plaintiff had failed to sustain the burden of proof of breach of warranty and based its decision upon two grounds, as follows:

"The implied warranty of the statute that the goods sold for a known particular purpose 'shall be reasonably fit for such purpose' (Cl. 1, Sec. 15, Chap. 165, R. S.) measures the buyer's right of recovery and the seller's liability. It is accordingly held that in the sale of wearing apparel, if the article could be worn by any normal person without harm and injury is suffered by the purchaser only because of a supersensitive skin, there is no breach of the implied warranty of reasonable fitness of the article for personal wear. Flynn v. Bedell Co., 242 Mass. 450, 136 N. E. 252, 27 A. L. R. 1504; Bradt v. Hollaway, 242 Mass. 446, 136 N. E. 254.

"In the case at bar, the cause of the plaintiff's skin affliction on the evidence remains a matter of doubt and conjecture. It may be that she was allergic to the dress shield or one or more of its component parts, but that cannot be known, her physician informs us until an intradermal test is made. It is, of course, possible that the shields contained deleterious and harmful chemicals or substances, but they were not analyzed and, if such be the fact, it has not been here established. We cannot resort to a choice of possibilities. That is guess work and not decision. Titcomb v. Powers, 108 Me. 347, 349, 80 A. 851; Edwards v. Express Company, 128 Me. 470, 148 A. 679; Thibodeau v. Langlais, 131 Me. 132, 159 A. 720." *Ross v. Porteous, Mitchell & Braun Co.*, supra, 3 Atl. (2d) at p. 653.

In *Stanton v. Sears Roebuck & Co.,* 312 Ill. App. 496, 38 N. E. (2d) 801, the plaintiff sued defendant for a breach of an implied warranty of fitness of a black rayon dress. In that case there was evidence that the wearing of the dress caused the buyer to suffer from dermatitis, but the court also found that there was no evidence that the dress contained any harmful or poisonous substance and that the burden of proof on that issue was on the plaintiff. The court held that the plaintiff had failed to produce any evidence that the defendant had violated any duty to her and also that Paragraph One of Section 15 of the Uniform Sales Act, (O. C. L. A. 71-115 (1)) "is not applicable to the factual situation presented by the record."

In *Bradt v. Hollaway,* 242 Mass. 446, 136 N. E. 254, plaintiff sued for alleged breach of warranty of fitness of a scarf purchased from the defendants, claiming that she suffered injury caused by wearing the purchased article. The court said,

> "There was no evidence or claim that the neck piece was unfit for ordinary wear, except as it may have caused the irritation and eruption of the plaintiff's skin."

The plaintiff produced no analysis of the dye which had been used in the fur, and there was testimony to the effect that her skin was hypersensitive. It was held that there was no evidence to warrant a finding that plaintiff's injury was due to any poisonous or injurious substance in the dye as alleged.

*Flynn v. Bedell Co.,* 242 Mass. 450, 136 N. E. 252, 27 A. L. R. 1504, was based on a similar claim for breach of warranty alleged to have caused injuries due to poi-

sonous or noxious substances in a dyed fur collar. In this case the court said,

> "It may well be that the scope of an implied warranty of fitness does not extend to fitness in respect to matters wholly unknown to the dealer and peculiar to the individual buyer. A seller of food presumably does not warrant that the particular kind of food which the buyer calls for will be suited to his peculiar idiosyncracies. So, where there is no evidence of any intrinsically unhealthy feature in a fur, but only that the buyer is constitutionally unable to wear fur of this sort because of a supersensitive skin, the warranty of fitness presumably does not apply." *Flynn v. Bedell Co.*, supra, 136 N. E. at p. 253.

In this case, however, there was expert testimony to the effect that the fur had caused the trouble, and the court held further that the particular defect which injured the plaintiff would have similarly injured any normal person. It was therefore held that the case was properly submitted to the jury. There is nothing inconsistent in this case with *Bradt v. Hollaway*, supra, which was decided on the same day by the same court.

*Barrett v. S. S. Kresge Co.*, 144 Pa. Super. 516, 19 Atl. (2d) 502, is a similar case. Plaintiff asserted that she bought for one dollar a cotton dress containing a poisonous dye which caused skin irritation. There was expert testimony that a quality of the dress had caused the irritation. In this the case differs from the one at bar. But there was also testimony that chemical analysis disclosed no substance that would cause irritation to the skin of a normal person. Defendant had sold four thousand of the dresses, and had no knowledge

of any unfortunate results except in the case of the plaintiff. The court said,

> "We do not conceive that the legislature intended under the Act of 1915, supra, that a retail vendor of wearing apparel obligates himself by an implied warranty that the merchandise he offers for sale, although harmless to practically all the public, does not contain any substance or ingredient that may injuriously affect some individual purchaser, who has a peculiar susceptibility unknown to the vendor. This, in effect, is appellant's theory. If sound, it would mean that many merchants have a far reaching and possibly a ruinous liability, which they cannot anticipate or with reasonable precaution avoid." *Barrett v. S. S. Kresge Co.,* supra, 19 Atl. (2d) at p. 504.

It was held that the evidence offered was insufficient to prove a breach of an implied warranty of quality.

*Miller v. Grant Co.,* 302 Mass. 429, 19 N. E. (2d) 704 was an action for breach of warranty of implied fitness of chop suey which the plaintiff purchased from the defendant. Plaintiff became sick after eating it. The court pointed out that there was no evidence concerning what else the plaintiff might have eaten prior to her attack of sickness. There was also no evidence of any analysis of the food or that it tasted bad or had a bad odor. It was held that the evidence most favorable to plaintiff did not afford a basis for more than a conjecture that her illness was due to an unfit condition of the chop suey. A directed verdict should have been allowed.

*Peet Stock Remedy Co. v. Bruene,* 210 Iowa 131, 230 N. W. 327, was a case in which plaintiff sued for breach of implied warranty of cattle powder. The warranty was that the powder, if properly used, would prevent

clover bloat. The court held that before the purchaser could recover it was incumbent upon him to establish by the evidence that he used the cattle powders in accordance with instructions. This he failed to do. It was held that the seller was entitled to a directed verdict.

*Karr v. Inecto,* 247 N. Y. 360, 160 N. E. 398, involved a breach of warranty of hair dye. The court said:

"There is no direct evidence of the nature of the dye contained in these bottles. We are asked to draw the inference that the liquid was dangerous because the staining of the right index finger was followed by a morbid condition on the same finger. The physicians who treated the finger say that in their opinion the morbid condition was not due primarily to a bacteriological infection, but to contact with a chemical irritant or chemical poison, and they 'think' that the condition was caused by the dye, because the finger was stained by the dye. We assume that the injury was due to a chemical irritant or poison. It manifested itself some twelve hours after the dye came in contact with the finger. The dye had been applied to the hair and scalp of the customer. It had trickled down her forehead. Apparently it had not injured her, yet without other evidence that the dye contained a chemical poison or irritant we are asked to assume that this so-called 'chemical product,' admittedly harmless to the customer, was dangerous and poisonous and caused injury to the plaintiff. Possibly some individuals may possess a peculiar susceptibility. We know only that, even if the dye used may possibly be a competent producing cause of a morbid condition such as developed on plaintiff's finger, it does not always produce such a result, otherwise the customer would not have escaped injury. All else rests purely on conjecture." *Karr v. Inecto,* supra, 160 N. E. at p. 399.

The trial court, as indicated by its opinion, was influenced to grant a new trial upon the authority of *Bruns v. Jordan Marsh Co.*, 305 Mass. 437, 26 N. E. (2d) 368. In that case plaintiff purchased a pair of shoes, and after having worn them a very few times the heel became detached, causing her to fall downstairs. She sued for breach of implied warranty of fitness and recovered. In that case there was evidence of an express warranty that the shoes were durable and substantial and that the heel became detached when the shoes were being used in the ordinary way. There was also evidence of an expert to the effect that the shoes were not suitable for the plaintiff's use and that they were not as represented by the salesman. The very evidence which was wanting in the case at bar was found to be present in the Bruns case, and it is distinguishable.

While some of the cases cited hold that there is no liability for breach of warranty when the product is reasonably fit for ordinary use by normal persons, even though persons of an unusual sensitivity may suffer from the use, we think the authorities also establish that when undisputed evidence discloses no poisonous or deleterious substance in the product when used in accordance with directions, the mere fact that plaintiff used the product and suffered injury thereafter is not sufficient to support a verdict for plaintiff.

The plaintiff does not charge the defendant in tort for negligently failing to warn him concerning alleged danger from improper use of the product. The charge is that the defendant warranted it to be suitable for cleaning garments when used according to instructions, and, by implication, warranted that it would

not be injurious to the plaintiff's hands when so used. Proof that plaintiff used it according to instructions and thereafter suffered harm is not sufficient to prove a breach of warranty under the peculiar circumstances of this case, unless he should prove further that he did not also use it in violation of instructions. Stated more specifically: proof that plaintiff "swished" the clothing in a solution containing sixteen tablespoons of the solution to two gallons of water and thereafter sustained injury would surely be insufficient to establish a breach of warranty if he also got the bleaching solution at full strength on his hands in the process of preparing the diluted liquid for use, or if he had also just previously used another bleaching fluid under circumstances wholly undisclosed (as was the case here). Now, the evidence neither affirms nor denies that his hands came in contact with the fluid at full strength, though that is within the realm of reasonable possibility. Evidence does disclose the existence of other possible causes for the injury in connection with the use of other bleaching fluids just before the purchase from the defendant, which use was at a strength and in a manner unknown to us. It may be argued that if plaintiff's hands came into contact with the White Magic at full strength (which without more would explain the injury) it would be the duty of defendant to show the fact as an affirmative defense. In many instances this would be true, but not in this one. We are not concerned with contributory negligence, but rather with the requirement of logical proof of an issue as to which the plaintiff has the burden. If the plaintiff had offered any evidence that there was some deleterious foreign substance in the bottle or that White Magic had some characteristic

which made it reasonably likely that it would cause injury when used as directed, he would be entitled to present that evidence to the jury for their consideration, even though there were other possible explanations of the injury. But no such evidence was offered. No expert testified that White Magic in any form caused the injury or that in the prescribed diluted form it could or would cause it. Under these peculiar circumstances, evidence showing merely that injury followed the use was insufficient. "Post hoc ergo propter hoc" is the classic phrase descriptive of a formal fallacy, not of a logical conclusion.

In view of the absence of any proof of the injurious quality of the product when properly employed, it would at least be necessary for plaintiff to produce evidence which would, to a reasonable extent, remove the possibility that the injury was produced by causes for which the defendant would not be responsible. This is especially true when the presence or absence of such other possible causes is a matter exclusively within the knowledge of the plaintiff. Only by producing such negative evidence could plaintiff present a case on the issue of proximate cause which would rise beyond the grade of mere speculation. Only so could he combat the undisputed evidence of defendant concerning the harmless quality of the fluid when properly used. This was the method employed in *Naumann v. Wehle Brewing Co.,* supra, where it was held that when a bottle of ale exploded, it was permissible to infer that there was a defect in the bottle, *where evidence tended to eliminate all other possible causes* for the explosion. It must be remembered that the sale as a bleaching fluid of a product that did not bleach would itself constitute a breach of warranty. The very ingredient and quality

which makes the fluid harmful if improperly used is the ingredient and quality which makes it fit for the purpose for which it was purchased when properly used.

Thus, we are left to speculate whether plaintiff's injury was caused by his contact with the diluted solution or with the undiluted one, whether it was caused by the manner in which the other bleaching fluid was used on the previous day, or perhaps whether it was due to the peculiar susceptibility of the plaintiff. It is not necessary for us to go as far as some of the cited cases which hold that there is no breach of implied warranty where the injury is caused by the peculiar susceptibility of the purchaser, persuasive as those cases may be. It is sufficient for us to say that the plaintiff failed to present sufficient evidence to go to the jury and therefore that the order for a new trial must be reversed and the judgment for the defendant reinstated, regardless of any error in instructions. Judgment reversed.