[No. 31824. Department Two. January 17, 1952.]

EMERY T. RINGSTAD et al., Appellants, v. I. MAGNIN & Co., Respondent.[1]

[1]Reported in 239 P. (2d) 848.

*Dodd & Russell*, for appellants.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Altha P. Curry*, for respondent.

HILL, J.—The question presented is: Does the plaintiffs' amended complaint state a cause of action on the theory of either negligence or breach of warranty of fitness?

The facts, unmixed with conclusions of law, as garnered from the allegations of the amended complaint, are that Emery T. Ringstad purchased from I. Magnin & Co. a summer cocktail robe for his wife, Helen Louise Ringstad. Two days later, while she was preparing food in the kitchen, the robe came into "casual contact" with a burner of an electric stove "and it instantaneously burst into a sheet of flame which spread with explosive rapidity."

This action was commenced to recover damages for the injuries sustained by Mrs. Ringstad, on the theories that: (1) I. Magnin & Co. had been guilty of negligence which was a proximate cause of the injuries; and (2) there had been a breach of an implied warranty of fitness. The trial court, concluding that there could be no recovery on either theory, sustained a demurrer to the amended complaint and dismissed the action. This appeal followed.

■ The general rule as to liability for tort in such a case is:

"A vendor of a chattel manufactured by a third person [which category would include retail dealers handling wearing apparel, such as I. Magnin & Co.], who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not subject to liability for harm caused by the dangerous character or condition of the chattel even though he could have discovered it by an inspection or test of the chattel before selling it." Restatement, Torts, 1948 Supp., § 402.

Appellants have relied upon and quoted extensively from the original § 402 of Restatement of the Law of Torts and the comment thereon. It is conceded in the 1948 supplement that the original § 402 was misleading. We prefer the rule as restated in the supplement and quoted *supra*; it is consistent with reality and common sense, and represents the overwhelming weight of authority. The following quotation from the comment contained in the 1948 supplement expresses our views:

"There is a clear distinction between the liability of a manufacturer and that of a vendor for harm caused by a chattel made by the former and sold by the latter. The

manufacturer of a dangerously defective chattel is the creator of something which is foreseeably dangerous when it is used for the purpose for which it is manufactured. The constructing of the chattel defectively, with knowledge it is to be sent out to be used, is an unreasonably dangerous activity. On the other hand, the vendor who reasonably believes that the chattel he is selling is safe for use is not, in selling and delivering the chattel, doing anything which is foreseeably likely to cause harm. The slight risk inherent in the possibility the chattel may be defective is not sufficient to constitute an unreasonable risk. The burden on the vendor of requiring him to inspect chattels he reasonably believes to be free from hidden danger outweighs the magnitude of the risk that a particular chattel may be dangerously defective (See §§ 291-293). Negligence is determined in the light of the facts known to the actor."

The negligence alleged is that I. Magnin & Co. offered the robe for sale

". . . without testing and examining the material used in the manufacture of the fabric for resistance to flame or heat and without warning the buying and consuming public, and particularly the plaintiffs herein, as to the inherent danger of explosive ignition upon casual contact with flame or heat. The resistance of materials used in said robe to flame and heat was subject of easy determination and could have been ascertained had the employees, agents and representatives of the defendant used the proper care and skill customarily employed by such retail organizations for the protection of the consuming public."

█ Nowhere in the amended complaint is there any allegation that I. Magnin & Co., as the "vendor of a chattel manufactured by a third person," knew or had reason to know that the garment sold was or was likely to be dangerous, as required by the rule quoted *supra*, in order to establish liability for negligence. The allegation, as noted, is that if I. Magnin & Co. had made a test it would have discovered the inherent danger of explosive ignition; but the general rule is that there is no obligation on the retailer to make such a test in the absence of some circumstance suggesting the necessity therefor. So far as appellants' cause

of action is predicated upon negligence, the demurrer was properly sustained.

But the amended complaint was drafted with the intent to state a cause of action based upon a breach of an implied warranty of fitness, in reliance upon the uniform sales act and specifically Rem. Rev. Stat., § 5836-15(1) [P.P.C. § 860-9], which is as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

■ Under that subsection there are two prerequisites to an implied warranty of fitness: First, the buyer must make known to the seller, expressly or by implication, the particular purpose for which the article is required; and second, the buyer must rely upon the seller's skill and judgment when he purchases the article. *Cochran v. McDonald*, 23 Wn. (2d) 348, 161 P. (2d) 305 (1945).

■ It is obvious that an article of wearing apparel is to be worn, and that purpose must have been known to the seller. The fact of the sale itself is sufficient to indicate that the seller knew the particular purpose, and thereby satisfies the first prerequisite.

■ The amended complaint states that the buyer examined the robe

". . . for color, texture, size, style and design, but was totally and wholly uninformed as to the safety factor of the fabric from which the garment was manufactured and the resistance of said fabric to flame or fire; and said plaintiff [buyer, appellant] relied wholly and exclusively upon the defendant [seller, respondent] . . . to market merchandise which was fit for the purposes for which it was intended and safe for public use."

That is a sufficient allegation of reliance by the buyer on the skill and judgment of the seller on an essential point in determining whether the garment in question was reasonably fit for the required purpose. We therefore hold that

the amended complaint sufficiently alleges the two prerequisites to a breach of warranty of fitness as set forth in Rem. Rev. Stat., § 5836-15 (1).

Respondent urges that, prior to the uniform sales act, the rule of *caveat emptor* would have applied to a sale such as that alleged here, and that it was not intended by the uniform sales act to extend the implied warranty of fitness to merchandise sold over the counter, inspected and selected from a quantity stock. Respondent concedes that we have applied the implied warranty of the statute to sales of food, but insists that food cases represent an exception to the rule.

Appellants rely upon the case of *Deffebach v. Lansburgh & Bro.*, 150 F. (2d) 591, (1945) 168 A. L. R. 1052, in support of their claim to a right to recover on an implied warranty of fitness. That case is squarely in point, the only distinctions being that the garment was a lounging robe and not a cocktail robe, and that it was ignited when the wearer waved, or "fanned," a match after lighting a cigarette instead of by "casual contact" with a burner on an electric stove. The court in that case said:

"The robe was bought, as appellee concedes, for use as a lounging robe. This purpose was obvious and therefore known to the seller. Since the buyer was not expert in textiles, we cannot agree with the view that her examination of the robe ought to have revealed the fact that it would burn up in an instant if it came in contact with flame. We think she clearly relied on the seller's judgment that it was fit for use. In fact, appellee now concedes that the only question in the case was whether or not the robe *was* reasonably fit for use as a robe. Since outer garments intended for domestic wear are not unlikely to come into momentary contact with lighted matches, tobacco, or stoves, it seems to us clear that a robe which, when this contact occurs, instantly bursts into flame and inflicts severe injury is unreasonably dangerous and unfit for use."

In conformity with its primary contention, respondent takes the position that the *Deffebach* case is bad law and that we should disregard it. However, some attempt is made by the respondent to distinguish that case from the present one. The distinguishing feature relied upon is that, while it

might be expected that a lounging robe or cocktail robe would be subjected to flame and heat hazards that come from cigarette lighting and smoking (and indeed, according to our current mores, what garment is not subject to that hazard?), it is not to be expected that it would be subjected to the hazard of "casual contact" with a burner of an electric range. That really goes to the issue of whether a proper use was being made of the garment, and will be discussed later in this opinion.

There are several jurisdictions which, clinging tenaciously to the rule of *caveat emptor,* insist that the uniform sales act, despite the plain wording of the subsection now under consideration, does not apply to retail sales made over the counter, where the merchandise is inspected by the buyer and selection is made from a quantity stock. Other jurisdictions do make the warranty of implied fitness applicable to sales of wearing apparel, and on a basis which seems to us logically sound.

In *Barrett v. S. S. Kresge Co.,* 144 Pa. Super. Ct. 516, 19 A. (2d) 502 (1941), the court said:

"The appellant asserts that under this provision she is entitled to the benefit of an implied warranty that this dress was reasonably suitable and safe to be worn by her. We have held this section applicable to sales of food and beverages intended for human consumption and she contends that by the same reasoning a warranty should be upheld as the wearing of this article of apparel affected her health. She relies chiefly on *Grant v. The Australian Knitting Mills, Ltd, et al,* 105 A. L. R. 1483; *Zirpola v. Adam Hat Stores,* (N. J.) , 4 A. 2d 73; and *Bianchi v. Denholm and McKay Co.,* (Mass.), 121 A. L. R. 460. *No sound distinction can probably be logically drawn between a noxious thing taken internally, and wearing apparel, containing a poisonous dye, meant to be worn next to the skin.*" (Italics ours.)

See *Flynn v. Bedell Co.,* 242 Mass. 450, 136 N. E. 252 (1922), 27 A. L. R. 1504; *Rogiers v. Gilchrist Co.,* 312 Mass. 544, 45 N. E. (2d) 744 (1942); *Payne v. R. H. White Co.,* 314 Mass. 63, 49 N. E. (2d) 425 (1943).

In the cases cited in the quotation from the *Barrett* case, *supra*, the plaintiff recovered on a warranty of implied fitness in *Grant v. The Australian Knitting Mills, Ltd.*, because underwear purchased from the defendant contained free sulphite, which, combined with perspiration, forms a powerful irritant harmful to normal skin; in *Zirpola v. Adam Hat Stores*, the plaintiff recovered on such a warranty because the ribbon and band in a hat contained an aniline dye which caused his illness, the evidence showing that use of such dye was forbidden in several states and that four to five per cent of all persons coming in contact with it would be injured to an appreciable extent.

In the *Barrett* case and in *Ross v. Porteous, Mitchell & Braun Co.*, 136 Me. 118, 3 A. (2d) 650 (1939), it was recognized that the implied warranty of fitness applies to sales of wearing apparel, but recovery was not permitted because it was established in each case that the plaintiff's injuries were attributable to an allergy and that the garment would not have harmed a normal person. As was said in the *Ross* case:

"The implied warranty of the statute that goods sold for a known particular purpose 'shall be reasonably fit for such purpose' (Clause 1, Section 15, Chapter 165, R. S.) measures the buyer's right of recovery and the seller's liability. It is accordingly held that in the sale of wearing apparel, if the article could be worn by any normal person without harm, and injury is suffered by the purchaser only because of a supersensitive skin, there is no breach of the implied warranty of reasonable fitness of the article for personal wear."

We see no logical distinction, so far as fitness for use is concerned, between garments which cause skin infections on normal people and garments which, on momentary contact with flame or heat, ignite instantly and are of such composition that the flames spread with explosive rapidity.

Many cases hold that reliance on the seller's skill and judgment may arise by implication from the facts in the

case. As was said in *Kurriss v. Conrad & Co.*, 312 Mass. 670, 682, 46 N. E. (2d) 12 (1942):

"The question is squarely presented whether the plaintiff, by implication, had a right to rely upon the expectation that she would not be sold a dress that contained some deleterious substance, not observable or discoverable upon reasonable examination by her, which would cause her injuries.

"We think it may be assumed that the defendant did not intend to sell and that the plaintiff did not intend to purchase such a garment. . . . Where, as in the case at bar, in a sale over the counter of an article that is open to inspection, but where any practicable inspection would not disclose an unsound condition, the plaintiff, by implication, has a right to rely upon the skill and judgment of the seller." (Quoted and approved in *Payne v. R. H. White Co., supra.*)

 We hold in accordance with what we believe is the majority, and in any event the better, rule, *i.e.*, that the implied warranty of fitness applies to retail sales of wearing apparel where the prerequisites of Rem. Rev. Stat., § 5836-15 (1), are met.

Respondent also challenges the form and timeliness of the notice of the breach of warranty, required by Rem. Rev. Stat., § 5836-49 [P.P.C. § 854-33]. The statute requires that the seller be given notice of any breach of warranty within a reasonable time after the buyer knows or ought to know of the breach. The purpose is to give the seller timely information that the buyer proposes to look to him for damages for the breach.

Courts uniformly hold under such statutory provisions that the giving of such notice is a prerequisite to the recovery of damages. See annotation, 71 A. L. R. 1149.

The amended complaint alleges:

"That within a reasonable time after the happening of the accident herein referred to, and within a period of approximately three or four weeks, plaintiff, EMERY T. RINGSTAD, orally notified the assistant manager of the defendant, to-wit, a Mr. Carroll, of the breach of implied warranty and that he was contemplating instituting suit, and that about said time the employees of the defendant in

the department where said garment was furnished were also orally notified as to the breach of implied warranty."

What is a reasonable time and whether the notice is in such form as to inform the seller that the buyer is claiming a breach of warranty may, under certain circumstances, be determined as matters of law; but usually, and that is the situation here, they resolve themselves into questions to be determined by the trier of the facts. *Baum v. Murray*, 23 Wn. (2d) 890, 162 P. (2d) 801; *Bleyhl v. Tea Garden Products Co.*, 30 Wn. (2d) 447, 191 P. (2d) 851; 3 Williston on Sales (Rev. ed.) 37, § 484.

It is urged by the appellants that the demurrer to the original complaint should not have been sustained. Practically speaking, the only difference between the original complaint and the amended complaint is the addition of the allegation relative to notice. Neither the original nor the amended complaint stated a cause of action in negligence, and without an allegation of the notice required by Rem. Rev. Stat., § 5836-49, the original complaint stated no cause of action for a breach of warranty. *Schram v. Guttenburg*, 198 N. Y. S. 209. The demurrer to the original complaint was properly sustained.

As above indicated, it is our view that the amended complaint states a cause of action for breach of implied warranty of fitness, and the demurrer should have been overruled unless the amended complaint contains allegations which would defeat the right of recovery. Respondent's counsel makes a very persuasive argument to the effect that the amended complaint shows that the cocktail robe was being used for a purpose for which it was not intended, *i.e.*, it was being worn by Mrs. Ringstad while stirring a pan of gravy on an electric stove. We quote from its brief:

"The term 'cocktail robe' can be defined only with reference to the meaning of the two words used. In Webster's New International Dictionary, 2nd ed., Unabridged, we find the definition of 'robe' as 'a long loose outer garment reaching to the feet; a dress of a flowing and elegant style or make.' The word 'cocktail' is defined 'a short drink iced of spirituous liquor. . .' Therefore, the garment involved

must necessarily have been a long loose flowing, more or less elegant, garment intended primarily to be used in the home during leisure hours when people who indulge in spirituous liquor normally imbibe and under conditions where people would be expected to sit down and enjoy a drink rather than be working in a kitchen. The court can take judicial notice that a housewife cooking a dinner generally wears a simple garment allowing ease in operation or at least protects herself by an apron which will prevent her dress coming in casual contact with the electric burners."

■ We are taking no judicial notice as to what is generally worn in a kitchen. Moreover, we are not willing to base conclusions as to the appearance or uses of a cocktail robe on dictionary definitions of the words "cocktail" and "robe." The term "housecoat" is not defined in the source to which respondent refers; however, for a description one would hardly combine the definitions of "house" and "coat." In the present day, with modern household appliances and other labor-saving devices, and with servants the exception rather than the rule, the housewife frequently appears in a dual capacity, performing household tasks while dressed for other occasions. We do not question the rule on which respondent relies, i.e., that one cannot recover for the breach of an implied warranty if he suffers harm by reason of the improper use of the article warranted. *Fredendall v. Abraham & Straus, Inc.*, 279 N. Y. 146, 18 N. E. (2d) 11 (1938); *Landers v. Safeway Stores.*, 172 Ore. 116, 139 P. (2d) 788 (1943). Nor do we say that the use made of the cocktail gown was proper, but we do say that the propriety of the use made of the garment is a question for the trier of the facts.

The order of dismissal is set aside and the trial court directed to overrule the demurrer.

GRADY, HAMLEY, FINLEY, and OLSON, JJ., concur.