[Civ. No. 11646.  Second Appellate District, Division One.—January 11, 1939.]

MRS. LANOL ZAGER, Appellant, v. F. W. WOOLWORTH COMPANY (a Corporation), Respondent.

Ben C. Cohen and George Cohn for Appellant.

H. L. Breidenbach for Respondent.

YORK, P. J.—This is an appeal from a judgment in favor of respondent corporation in an action brought against it

by appellant for damages for personal injuries resulting from the application by her to her face and hands of a certain freckle cream which she purchased from respondent.

The first amended complaint contained three causes of action, the first upon the implied warranty arising from the sale of the cream that it was suitable for the purposes for which it was required and would be of merchantable quality and character; the second upon an express warranty that the cream was pure and wholesome and not dangerous. The third cause of action was directed against the manufacturer of the product upon the theory of negligence; however, said manufacturer was not served and no proof was offered at the trial in support of this cause of action.

The facts which form the basis of the first amended complaint may be summarized as follows: On November 11, 1936, appellant accompanied by her husband entered the store of respondent and asked one of the salesgirls if she had something to remove freckles, whereupon she was handed a package of Nadinola Freckle Cream. Appellant asked said salesgirl if it were dangerous, to which said salesgirl replied that it was not dangerous and that "Woolworth stands behind it and guarantees its satisfaction". Appellant then purchased a jar of the cream and left the store. That night after washing her face with soap and water, appellant applied a thin coating of said cream to her face and forehead. She then retired and about 1:30 o'clock was awakened by an itching and burning sensation in her face, and upon examination found it much inflamed and swollen. The following day she consulted a physician who made a patch test by applying the cream to her left thigh with the result that an eruption appeared on her leg where the test had been made. On November 14, 1936, she consulted Dr. Saul Robinson, who diagnosed her case as dermatitis venenata, and who continued to treat appellant until December 7, 1936, when the skin cleared.

In her first cause of action of the first amended complaint, appellant alleged that by reason of the purchase made by her from respondent, the latter then and there impliedly warranted and represented to her that the cream in question was pure, wholesome, harmless and fit for removing freckles and suited for the purposes for which said product was required, and that it was of merchantable quality and char-

acter. In her second cause of action, appellant alleged that she relied upon and was induced to purchase said cream by the statement made by the employee of respondent that said freckle cream was not dangerous and that respondent stood back of it and guaranteed its satisfaction. There were also allegations to the effect that said cream contained harmful ingredients including mercury and that as a result of applying said cream to her face appellant sustained the following injuries: "The face of plaintiff became swollen, erythematous, and covered with large and small blisters; the eruption also involved the ears, neck, upper chest, arms, forearms and hands of plaintiff in the form of erythematous vesicular and bullous areas." Further, as result of said application of the said freckle cream, appellant suffered injuries to her eyes and kidneys, nervous shock, sleeplessness and severe pain and suffering, all to her damage in the sum of $2,900.

Respondent interposed a general and special demurrer which was overruled, whereupon respondent answered and denied specifically all the material allegations of said complaint setting up as a separate and distinct defense, thereto "that whatever injury or damage, if any, was suffered by plaintiff, whether as alleged or otherwise, that the same was the direct, proximate and sole result of plaintiff's physical and bodily condition and constitutional composition on, prior and subsequent to the 11th day of November, 1936".

Appellant offered evidence in support of the allegations of her first amended complaint, although she did not introduce into evidence the analysis which was made of the cream contained in the jar which she purchased, as aforesaid; neither did she produce as a witness the salesgirl from whom she purchased the jar of cream, nor the physician who made the patch test on her thigh the day after she used the said cream.

Respondent produced as a witness a physician who had seen appellant in his office accompanied by her attorney about a week or ten days prior to the trial of the action herein, at which time appellant, upon the advice of her attorney, refused to submit to a blood test. Apparently the purpose of this testimony was an attempt to prove the allegations of respondent's affirmative defense, as above noted. Other than this doctor, the only other witnesses produced

by respondent were women who had used the same brand of freckle cream successfully and without harmful results.

Dr. Saul Robinson, who attended appellant, testified upon direct examination as follows:

"Q. The first occasion (referring to Nov. 14, 1936) you examined her, did you form a diagnosis? A. Yes, we would make a diagnosis of dermatitis venenata due to some external irritant to which the patient was sensitive . . .

"The Court: What is that, an allergic condition?

"A. Well, it can be allergic and it can be called also an allergic dermatitis, meaning to some external source, but dermatitis venenata means something external. An allergic condition can be due to internal, some food. In this case it was external. Q. Did you form any opinion as to what that irritant might be that caused this condition? . . . A. Yes; of course, in making a diagnosis, especially in a skin disorder, we always start with a history; and the history in this case as given was the use of a certain proprietary freckle cream put on in the evening at 11 o'clock or about 11:30, and within a period of four or five hours, I judge, after the application, at the site of the application of the cream, why, this dermatitis and swelling began, and that fits in with our common knowledge of what we call a dermatitis venenata, due to something—in this case in the cream, coming on in that period of time, and the fact that the eruption also was present on the hand which was used in the application of the cream, also tending to confirm suspicion that the cream was at fault. . . .

"Q. Will you state whether or not in your opinion Mrs. Zager's skin is sensitive? A. Well, from the history and the fact that she has appeared now—this is the third time since last November, and each time with an irritated dermatitis of the skin, I judge she has a sensitive skin. Q. Prior to the time of this happening? A. No, not necessarily. In this type of dermatitis, why, after a severe dermatitis venenata, such as this, it is not uncommon to find patients become susceptible to other things, such as dyes in clothing they wear or material such as wool or silk or plants which heretofore have not bothered them, and it is not unusual to see this history appear at various times since the onset of a severe dermatitis. Q. In other words, as I understand you, since dermatitis originally occurred, it is not unusual for

a recurrence of dermatitis to other ingredients as a result of the original? A. Yes; the history here is that she had no dermatitis previous to the application of the cream, and she had been using various creams and been exposed to paint and varnish at times, and since that time she has been having trouble with her skin."

In answer to the question by the court "You have had it (the freckle cream) analyzed, have you not?" the attorney for appellant replied: "It is impossible to have it completely analyzed. We have been able to have it analyzed to only a certain extent. In other words, the portion in the jar is incomplete for complete analysis. As far as our case is concerned, I might mention that I don't think that we would have to show an analysis. We just had this done as an extra precaution in case, but it is impossible for anybody, or the chemist, rather, to make a complete analysis. We know there is mercury in the cream, and that is all we do know—and I cannot see why we cannot bring out the fact, assuming that there is mercury, that that would constitute an irritant. There may be a hundred elements in that cream. We do not know that one of the elements, or combination of elements, probably caused this particular thing."

Upon cross-examination, Dr. Robinson was asked: "Now, is it fair to say, if Mrs. Zager prior to the application of this freckle cream had some other irritant in her life which caused a dermatitis, and then she took this freckle cream, it would simply bring to a head the condition that was already there? . . . Isn't that true? A. That is she had trouble before? Q. Yes. A. Yes. . . . More specifically, she would have a prior existing condition before that, due to a severe reaction to freckle cream, by the ingredients in the cream, there is no question that she had an idiosyncrasy, or an idiosyncrasy, that is very uncommon to have such a marked reaction.

"Q. You are satisfied that she had an idiosyncrasy, are you not? A. Yes, she had it to this particular cream. Q. Now, will you tell us, Doctor, in view of your bringing up the word, how idiosyncrasy differs from an allergic? A. It is the same thing. Q. And it all boils down to the meaning of 'hypersensitive' does it not? A. Yes, you have to say 'hypersensitive'. Q. It means the same as allergy? A. Yes, that is what it is. . . .

"Q. Now getting down to the point we were discussing this morning . . . might there be a dermatitis from exposure to an irritant without contact? By that I mean by being in the same room? A. Yes, there may be, but it would not be localized around the point or places which were so definitely defined in her face. Q. Dermatitis always breaks out where contact occurs? A. Yes, that is the site of the most involvement, that is the place where direct contact is. . . . Q. You don't mean to say that when you saw her November 14th she had a localized dermatitis. A. Yes, there were masses on the face and on portions of the hand where the cream had touched her hand, and all other areas there were free. Q. All other areas free? A. Except the place touched by the hand where the irritant was pressed. . . . Q. And on the left thigh there was a localized dermatitis? A. Yes. Q. And on the right limb and on the remaining portion of the left limb, was it clear? A. Yes. There is one thing about this type of dermatitis, it tends to spread. You must remember I saw her several days afterwards, and there was the secondary area of the skin, secondary to the localized areas. Q. What portions of her body were involved when this condition was at its worst? A. When this condition was at its worst, her face, her neck, and her hands were involved; the forearms were involved; and there was an area on the left thigh where this test had been done. . . .

"Q. During the course of treatment of Mrs. Zager, did you ever ask for an examination of her blood? A. No, I didn't ask for any blood examination. Q. Did you have, as a result of your examination and treatment of Mrs. Zager, any knowledge of the condition of her blood? A. No, I didn't, for the reason that there was nothing in her blood that would have anything to do with this particular skin disorder. Q. There was nothing in her blood that had anything to do with it? A. The examination of the blood infers the Wasserman test for syphilis and there are no lesions in syphilis that would produce a skin lesion such as she had, it was not present; and another thing, in the blood would be possibly anemia, which had nothing to do with the acute dermatitis of this nature; and further, if the blood had something wrong with it, it would be just a coincidence

and have nothing to do with this skin disorder, inasmuch as nothing was done for the blood, and yet her skin disorder cleared up in quite a short time. . . .

"Q. Did you ask Mrs. Zager what kind of soap she had used? A. No, I don't think I asked Mrs. Zager that question for the simple reason that most of her condition was about the eyes. If the soap was at fault, I expect the dermatitis would be uniform. . . . I did not see the connection with dermatitis, soap does not positively produce a dermatitis of this nature. I may say, with my experience with dermatitis, without knowing the ingredients here, I am sure the fact that mercury was probably at fault in the marked erythema and redness and swelling commonly found in mercurial dermatitis. Q. But you did not ask what kind of soap she had been using? A. No. Q. Or you did not know whether the soap she had used contained mercury? A. No. Q. The first thing she told you was she used freckle cream and you said 'That is it', isn't that true? A. She made a patch test with the freckle cream. That is quite conclusive evidence that it was a strong irritant to her skin. She had evidence to show me on the leg. Q. Did you ask whether or not she had washed that portion of her leg with soap? A. If she did, she would have to be very clever, because it was quite square and triangular. She would have to go around corners to do it."

At the conclusion of the trial, the court made, among others, the following findings of fact: (1) That appellant purchased the cream but that respondent did not impliedly warrant or represent to her that the freckle cream was either pure, wholesome, harmless or fit for removing freckles or suited for the purpose for which it was required, or that it was of merchantable quality or character; (2) that the freckle cream was fit for removing freckles, contained no harmful ingredients, whether mercury or otherwise; that respondent had no knowledge of the nature of the cream; that appellant suffered some dermatitis and inflammation of the skin of her face and hands, but that the itemization of her injuries was not true; (3) that said cream was not dangerous and was fit for use as a freckle remover and was of merchantable quality and character; (4) that in making her purchase of said jar of freckle cream, appellant did not rely upon any representations whatsover and that no

warranties were made; (5) that "whatever dermatitis or inflammation existed is not of a permanent nature and plaintiff has not been damaged in any sum whatsoever in so far as the F. W. Woolworth Company defendant is concerned"; (6) that appellant incurred medical expense in the sum of $80 for which respondent is not responsible; (7) that "no warranties whatsoever, whether implied or expressed, were made as alleged by plaintiff by the F. W. Woolworth Company, and further that Nadinola Freckle Cream, including that purchased by plaintiff, was fit for the purpose for which it was intended". It was further found by the court that "whatever dermatitis or inflammation plaintiff experienced was the result of her physical and bodily condition and constitutional composition on, prior and subsequent to the 11th day of November, 1936".

As conclusions of law the court found that respondent made neither an implied nor an express warranty to appellant; that the cream was reasonably fit for the purpose for which it was intended and that appellant was entitled to take nothing as against respondent. Judgment was thereafter entered accordingly.

Upon this appeal it is urged by appellant that (a) the finding of fact and conclusion of law that there was no implied warranty upon which appellant relied in her first cause of action, is wholly unsupported by the evidence and is contrary to law; (b) the finding of fact and conclusion of law that there is no express warranty resulting from the purchase of the freckle cream by appellant from the respondent is entirely unsupported by the evidence and is contrary to law; (c) the finding of the court that the dermatitis was the result of appellant's physical and bodily condition and constitutional composition on, prior and subsequent to the 11th day of November, 1936, is wholly unsupported by, and finds no warrant whatever in the evidence; (d) the finding of the court that respondent had no knowledge of the contents or ingredients of the cream or its dangerous character, shows that the court misconceived the issues, as such knowledge is chargeable to the defendant by law; (e) the trial court entirely misconceived the scope and effect of the law with respect to warranties, express or implied, and this failure to apply the correct principles of law to the facts resulted in a

miscarriage of justice; (f) the finding that there were no harmful or injurious ingredients in the freckle cream finds no support whatever in the evidence.

Appellant based her action herein upon the provisions of section 1735 of the Civil Code, to wit: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality."

While it must be conceded that the evidence introduced on behalf of respondent was weak, there is sufficient evidence in the record to support the allegations of respondent's separate and distinct defense to the action, and also to support the finding of the trial court that "whatever dermatitis or inflammation plaintiff experienced was the result of her physical and bodily condition and constitutional composition". The evidence to which we refer was brought out by respondent's counsel in his cross-examination of Dr. Robinson, hereinbefore quoted.

While the complaint was based upon the implied or express warranties arising from the sale of the cream itself and not upon any negligence of respondent, the theory of respondent's separate and distinct defense was that because of appellant's hypersensitive skin and her constitutional composition which made her allergic to certain irritants, respondent could not be held liable in damages even though an implied warranty might attach by reason of the sale itself, or because an express warranty might attach thereto on account of the statement made to appellant by the salesgirl who sold her the freckle cream. Under well-settled principles of law, it became a question of fact for the court to determine which of the two theories presented should pre-

vail. While the record contains evidence which might have supported contrary findings, the evidence to which we have referred justifies the inference that appellant's constitutional composition was the proximate cause of the dermatitis which she suffered. It therefore follows that the finding of the court in favor of respondent's separate and distinct defense is supported by some evidence, and is therefore conclusive upon this court and cannot be disturbed upon appeal (*DePuy* v. *Shay,* 127 Cal. App. 476 [16 Pac. (2d) 158]; *Armbrust* v. *South,* 128 Cal. App. 53, 56 [16 Pac. (2d) 692]; *Kienlen* v. *Holt,* 106 Cal. App. 135, 140 [288 Pac. 866].)

The judgment appealed from is affirmed.

Doran, J., and White, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 2, 1939.