Barrett et al., Appellants, *v.* S. S. Kresge Company.

Argued March 7, 1941.

Before KELLER, P. J., CUNNINGHAM, BALD-RIGE, STADTFELD, RHODES and HIRT, JJ.

*Paul A. McGlone,* with him *Frank J. McDonnell,* for appellants.

*Walter L. Hill, Sr.,* of *O'Malley, Hill, Harris & Harris,* for appellee.

OPINION BY BALDRIGE, J., April 16, 1941:

The plaintiffs, husband and wife, brought a suit in assumpsit alleging a breach of warranty under the Sales Act of May 19, 1915, P. L. 543, 69 PS §124. The action had been previously tried and a verdict obtained by the wife plaintiff. During the course of that trial a voluntary nonsuit was entered as to the husband. A new trial was granted on the ground that certain specific

findings of the jury were against the weight of the evidence.

The second trial resulted likewise in a verdict for the wife plaintiff, Mrs. Barrett, and thereafter the defendant filed a motion for judgment n. o. v., which the court granted. Hence this appeal.

The facts adduced at this second trial may be summarized as follows: Mrs. Barrett purchased from the defendant, for the sum of one dollar, a cotton dress, which she alleged contained poisonous dye, from a rack with a sign thereon reading "Guaranteed fast colors." Shortly after the first time she wore this dress a severe skin irritation appeared on her body and arms diagnosed by the doctors as acute dermatitis. This action was brought to recover damages for her injuries. The medical testimony on behalf of the plaintiff respecting her physical condition was given by Drs. Clark and O'Malley.

The former, a clinical pathologist, saw the plaintiff during the course of her illness. He made "patch" tests on her skin and expressed the opinion that she had a type of allergy that reacts to an irritant. He attributed her skin affliction to the wearing of this dress, which contained "a substance which, when it was put into the solution with water, was extremely toxic to Mrs. Barrett, to the absorption in her skin." Upon being asked by the court to explain what he meant by "toxic" he said: "Extremely poisonous, producing the typical reaction and violently red area under the place where the cloth was adjusted to the skin surrounded by a larger area of inflammation that eventually extended up her entire arm." Neither he nor any other witness stated that the material in the dress would cause irritation to anyone other than Mrs. Barrett.

Dr. O'Malley expressed the opinion that the plaintiff's physical condition was caused by a dye, but when asked if he would say that there was anything poisonous chemically in the dress, replied: "All I know is she had

this irritation." The testimony adduced by the plaintiffs did not establish the presence of any specific poisonous substance in the dress, which would harmfully affect any normal person.

The defendant called a number of witnesses including Dr. Whitehead, a skin specialist, who testified that he made tests of the material on four persons without any injurious reaction. He and Dr. Davis expressed the opinion that the dermatitis from which Mrs. Barrett suffered was due to her individual allergic nature. Dr. Jaggard, a chemist, stated that he subjected the material in the dress to chemical tests for impurities but he found no substance that would cause irritation to the skin of a normal person. It was shown that the defendant sold four thousand of these dresses and that it had no knowledge of anyone else experiencing any skin reaction to the wearing of them.

Section 15 of the Sales Act of 1915, supra, provides in part as follows: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: First. Where a buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

The appellant asserts that under this provision she is entitled to the benefit of an implied warranty that this dress was reasonably suitable and safe to be worn by her. We have held this section applicable to sales of food and beverages intended for human consumption and she contends that by the same reasoning a warranty should be upheld as the wearing of this article of apparel affected her health. She relies chiefly on *Grant v. The Australian Knitting Mills, Ltd. et al.,* 105 A.

L. R. 1483; *Zirpola v. Adam Hat Stores,* (N. J.), 4 A. 2d 73; and *Bianchi v. Denholm and McKay Co.,* (Mass.), 121 A. L. R. 460. No sound distinction can probably be logically drawn between a noxious thing taken internally, and wearing apparel, containing a poisonous dye, meant to be worn next to the skin.

In none of the food and beverage cases, however, was there proof that a plaintiff was peculiarly allergic to something not harmful to others. In each there was the presence of a poison or irritant that undoubtedly was intolerant and injurious to the average person. It is well known that some people are so constituted that they cannot eat fish, strawberries, eggs, and many other foods that could be mentioned, without ill effects. It can hardly be said that a vendor thereof would be liable for a breach of an implied warranty solely because of the harmful effect due to a buyer's individual idiosyncracy.

In the Grant case, which had its origin in Australia, the plaintiff purchased from the defendant underwear containing free sulphite, which, combined with perspiration, forms a "powerful" irritant, harmful to normal skin. The plaintiff brought suit to recover for injuries resulting from dermatitis caused by this wearing apparel. There was an express finding there that his skin was not peculiarly sensitive but had been perfectly normal prior to the affliction of which he complained.

In the Zirpola case the ribbon and band used in a hat sold to the plaintiff contained an aniline dye termed "paraphenylenediamine," which caused his illness. He produced expert testimony that showed this dye was of a poisonous nature, had been forbidden in New York and other states, and that four to five per cent of all persons coming in contact with it would be injured to an appreciable extent. The court in the course of its opinion stated that it was unnecessary to prove that all persons are susceptible to a particular poison and

that injury would be the inevitable result of the use of an article in which it was present.

In the Bianchi case it was shown that face powder contained two definite irritants, aniline dyes, which would not affect the average person, but that it would be injurious to "some" whose skin is allergic thereto. It appears therein that the plaintiff was one of the latter class of persons indefinite as to numbers or percentage. The defendant was held liable for a breach of an implied warranty of fitness. The court, however, in the course of its opinion, said p. 463: "The case does not call for a consideration of the possible legal consequences which may follow from the use of such substances or products by a person who may be said to be 'allergic' to them." We do not construe those decisions as warranting a recovery in this case.

In *Ross v. Porteous, Mitchell & Braun Co.*, 136 Maine 512, 3 A. 2d 650, a woman purchased dress shields which caused a highly inflamed condition when they came in contact with her skin. There was no evidence that the shields contained any specific substance harmful to the normal skin. The court held that possibly the shields contained deleterious and harmful chemicals, but, as they were not analyzed, that fact was not established. The plaintiff, therefore, failed to sustain the burden of proof of showing a breach of an implied warranty of fitness.

In *Flynn v. Bedell Co. of Massachusetts*, 242 Mass. 450, 136 N. E. 252, a recovery was allowed for a breach of warranty on the sale of a dyed fur piece. It was not shown, however, that the buyer had any peculiar susceptibility. The court there said: "It well may be that the scope of an implied warranty of fitness does not extend to fitness in respect of matters wholly unknown to the dealer and peculiar to the individual buyer. A seller of food presumably does not warrant that the particular kind of food which the buyer calls for will be suited to his peculiar idiosyncracies. So, where

there is no evidence of any intrinsically unhealthful feature in a fur, but only that the buyer is constitutionally unable to wear fur of this sort because of a supersensitive skin, the warranty of fitness presumably does not apply."

We do not conceive that the legislature intended under the Act of 1915, supra, that a retail vendor of wearing apparel obligates himself by an implied warranty that the merchandise he offers for sale, although harmless to practically all the public, does not contain any substance or ingredient that may injuriously affect some individual purchaser, who has a peculiar susceptibility unknown to the vendor. This, in effect, is appellant's theory. If sound, it would mean that many merchants have a far reaching and possibly a ruinous liability, which they cannot anticipate or with reasonable precaution avoid.

After giving this interesting case careful consideration it is our unanimous opinion that the learned court below was correct in concluding that the evidence offered did not establish that the dress purchased by the plaintiff was not reasonably fit for the purposes for which it was sold, and, therefore, there was no proof of a breach of the implied warranty.

Judgment affirmed.