**HARDY**

v.

**PROCTOR & GAMBLE MFG. CO. et al.**

**No. 14614.**

United States Court of Appeals,
Fifth Circuit.

Jan. 6, 1954.

---

F. Fox Benton, Houston, Tex., Burris, Benton, Baker & Zwiener, Houston, Tex., of counsel, for appellant.

Jas. F. Bobbitt, Karl E. Kraft, Hamblen & Bobbitt, Houston, Tex., for appellees.

Before HUTCHESON, Chief Judge, and HOLMES and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

Ruth Hardy, appellant, plaintiff below, brought this suit against the appellees, alleging [1] that defendants had caused, and were liable to her for having caused, the loss of the sight of both her eyes.

The claim in two counts, one based upon implied warranty and the other based upon negligence, was that Dreft, though put out and sold as a safe product to use, was, when brought in sufficient quantity into contact with the human eye, dangerous and deleterious thereto, and the defendants had breached the implied warranty of safe use which accompanied the sale and had also been negligent in not giving adequate warning of the dangers inherent in its coming into contact with the human eye.

In addition to a denial that the use of the detergent Dreft was the proximate cause of appellant's injuries, the defenses were: (1) to the claim of warranty, that defendants had not warranted the product as safe for use in the eyes in the quantity and under the conditions claimed by plaintiff in this case; and (2) to the claim of negligence, (a) that the product Dreft contained no foreign, dangerous, or deleterious substance, but was composed only of the usual ingredients commonly incorporated in such products; that appellees did not know, and by exercise of reasonable diligence could not have known, that the detergent Dreft was, or would be, harmful to persons, using it in the manner and for the purpose for which it was manufactured; because in fact it would not be, (b) that plaintiff and all other persons using Dreft knew that it was not intended for use in the eyes and would cause painful consequences if induced therein, and therefore appellees owed no duty of warning appellant of such consequences.

The case was tried to a jury, and at the conclusion of the evidence for all the parties, the appellees moved for an instructed verdict which was granted.

---

1. Briefly summarized, this is what was alleged by plaintiff as to how the injury came about:

 She was a doctor's nurse in a clinic owned and operated by her employer in the City of Houston, Texas.

 Her duties included on occasions washing and cleansing her employer's surgical instruments, utensils, and other articles used in the operation of the clinic.

 On Oct. 2, 1949, and again on Oct. 16, 1949, she got into her eyes some of a product sold under the trade name of "Dreft" which she had bought on or about May of 1949, from the Blodgett Food Market, and was using at the time in the course of her employment in the washing and cleansing of the instruments above referred to.

 Dreft is a detergent, packed and sold in paper cartons in powdered form. It is exclusively manufactured by the defendant, Proctor & Gamble Manufacturing Co., and exclusively distributed by its subsidiary, Proctor & Gamble Distributing Company.

Appealing from the judgment on that verdict, appellant is here presenting as the only question on this appeal, whether the evidence[2] in the record in this cause, taken in its most favorable light to plaintiff, raised an issue for the jury,

2. Appellant summarized the evidence on which she relies as follows: Ruth Hardy, appellant, was a registered nurse, forty-four years of age and employed as a doctor's nurse in a clinic. A part of the duties of her employment were to keep the doctor's surgical instruments, utensils and other equipment clean and ready for use. On Sunday, October 2, 1949, appellant went to the clinic where she was employed to wash and cleanse the soiled instruments and utensils which had been used in the operation of the clinic on the previous day in order to have them ready for use on the following day. The clinic was not open on Sunday and, although it was equipped for air-conditioning, the airconditioning was not in operation.

The utensils and equipment to be washed were located in a small room containing a sink 15 inches wide and 18 inches long and approximately 8 inches deep. The sink was located in front of a window 3 feet by 4 feet, which was open.

There were two small fans in the room, one a stationary fan which was placed to appellant's left as she faced the sink on the drainboard, and the other, an oscillating fan, was located on a small table to her right and slightly behind her. It was a hot and humid day, and both fans were in operation.

Appellant had purchased a carton of the product "Dreft", a powdered detergent, for the account of her employer at a local retail food market, which carton contained a number of cardboard packages of the product designated by the manufacturer as the "Giant Size". An unopened box of Dreft from this carton was in the maid's room on October 2, 1949, and was opened by the appellant and used by her in the washing of the utensils and other articles in the sink. Appellant consumed about four hours in the washing operation, during the course of which she emptied powdered Dreft from the box into the sink sometimes into water in the sink and sometimes into the sink before the water was placed therein, a total of ten or twelve times during the washing operation.

During the washing operation, appellant was perspiring freely from her forehead and other parts of her face and the perspiration got into her eyes. Appellant's eyes began to burn and become irritated about one hour after she had started the washing operation, but she continued with her work until about three hours after she had begun, when her eyes were burning and smarting so much that she stopped her work and inspected her eyes, particularly the right eye, to see if there was anything in it. Appellant put one drop of pontocaine in her right eye to ease it and resumed her work for approximately another hour.

Appellant testified, in part, as follows:
"Q. At that time Miss Hardy, did you have any knowledge as to what was causing your eyes to burn and become irritated? A. I know I was sweating a great deal and the sweat would drip in my eyes before I had time to stop and wipe my forehead.
"Q. Did you form any opinion at that time as to what might have been causing your eyes to smart and burn? A. No.
"Q. Had you ever at any time previous to this occasion on Oct. 2, in your experience as a nurse or otherwise, known of anyone who had injured their eyes from having gotten Dreft into them? A. No.
"Q. Did you know, or did you think at that time, that getting Dreft in your eyes would cause any damage to them? A. No.
"Q. Now, do you know whether or not any of the Dreft powder collected or accumulated on your face while you were washing these utensils, Miss Hardy? A. Yes, it was in the perspiration on my face.
"Q. How do you know that some of the Dreft powder did accumulate on your face and in the perspiration that was there? A. I could taste it as the perspiration dripped down my face and could smell it when I wiped my forehead."

There was testimony that in the filling room at the plant of the appellee, Proctor & Gamble Manufacturing Company, where the boxes of Dreft were filled, that so much of the Dreft powder dispersed into the air that the air in the room looked like a cloud of smoke. This, in spite of special ventillating equipment, calculated to clear the air in the room. That the product is highly volatile and easily disperses into the air.

After Oct. 2, 1949, appellant's eyes gave her serious trouble, and she was under constant medical care until on or about Oct. 14th or 15th, 1949, when she was discharged as being able to return to work on October 17, 1949. On October 16, 1949, which was a Sunday, appellant

either under the theory of liability based upon implied warranty or that based upon negligence of appellees.

It is appellant's contention that this question should be answered in the affirmative. That of appellees is that it should be answered in the negative.

Appellant insists that this evidence raised issues from which the jury could have found:

again went to the clinic and washed instruments and utensils for a period of approximately three to four hours in the same room as previously with the fans operating and under virtually the same conditions as when she had previously conducted the washing operations on October 2, 1949. Again appellant's eyes became irritated and were burning, but she thought the irritation and burning sensation was due to the perspiration which was getting into them. No one had suggested to appellant that Dreft might be the cause of the injury to her eyes at any time between the first occurrence on October 2nd and the latter occurrence on October 16th.

Appellant had no knowledge of the chemical contents of Dreft and no means of obtaining that knowledge other than by employing a chemist to make a chemical analysis, which she did not do. There was no warning of any kind that the product was injurious or would be injurious to the eyes, nor anything on the package as to what effect it might have on the eyes.

Dr. Gordon L. Foote, a witness for defendants, testified as follows:

"Q. Were you aware of the fact before October, 1949, that some of your agencies had advertised this product 'Dreft' as being safe for use in the eyes? A. Being safe for use in the eyes?

"Q. Or that it would not injure the eyes? A. Prior to 1949?

"Q. Yes. A. I do know that we have advertised it as being safe for use in the eyes."

And further:

"Q. You do know that it was so advertised? That is what you testified to? A. It was advertised as being so safe that you could put it in your eye. I wasn't in the company at the time that happened."

A copy of one of such ads was introduced as defendants' Exhibit 5 and appears among the original exhibits transmitted to this court.

Dr. H. O. Nicholas, Associate Professor of Chemistry at Rice Institute, made an analysis of samples of Dreft taken from the package used by appellant on Oct. 16, 1949, which analysis showed approximately 65% of a material described by him as a "filler", about 33% of the detergent or surface active agent and about 4% moisture. It was Dr. Nicholas' opinion that the detergent or surface active material was a chemical known as "sodium lauryl sulphate".

Dr. Gordon L. Foote, an employee of the appellee, Proctor and Gamble Manufacturing Co., testified that the formula for Dreft was changed on March 1, 1949, but that the box that was used by appellant was manufactured before that date. The formula in effect before March 1, 1949, for Dreft contained approximately 35% sodium alkyl sulphate and 5% sodium alkyl benzene sulphonate, as the surface active or detergent materials. Sodium alkyl sulphate and sodium lauryl sulphate have virtually the same chemical properties as also sodium alkyl benzene sulphonate. The difference between sodium alkyl sulphate and sodium alkyl benzene sulphonate is that the former has as its base a vegetable oil, whereas the latter has a petroleum base. After the formula was changed on March 1, 1949, the sodium alkyl benzene sulphonate was increased from 5% to 26%, and the sodium alkyl sulphate eliminated practically altogether from the product. This new product was advertised as the "New and Milder Dreft."

Dr. George Albert Emerson, Professor of Pharmacology & Toxicology at the University of Texas Medical Branch at Galveston, made a series of tests to determine the effect of Dreft upon the eye mucosa. The eyes of rabbits are more nearly comparable to the eyes of humans than any other animal, and most nearly exemplify the results that may be expected in human eyes in the use of various chemicals and drugs. Dr. Emerson injected a solution containing 57% Dreft and 43% water into the eyes of several rabbits. The Dreft used was the New and Milder Dreft containing 26% of the detergent which made the strength of the surface active agent in the solution approximately 14.82%. Two drops of the solution were injected in one eye of each of four rabbits and within forty-eight hours the cornea of each of the four rabbits were so affected as to make the rabbits totally blind in the eyes in which material had been injected. Dr. Emerson testified further that he would expect the same result upon human eyes from injection of the same amount of the Dreft. He further testified that if there was an

(1) Appellant got some of the product Dreft into her eyes on Oct. 2, 1949, and Oct. 16, 1949.

(2) Dreft was the producing cause of the injuries to appellant's eyes and her resulting blindness.

(3) Sodium lauryl sulphate in Dreft renders it inherently dangerous to the eye.

(4) Appellees owed to appellant a duty to warn her of the presence in Dreft of the highly dangerous chemical and failure to do so was negligence.

(5) Appellant had no knowledge of the dangerous chemical in Dreft.

(6) Appellee knew or should have known of the harmful ingredients in Dreft.

(7) Failure of appellees to warn appellant of the presence of the dangerous chemical in Dreft was negligence and this was a proximate cause of the injuries and damages suffered by her.

Quoting from 65 C.J.S., Negligence, page 623, § 100, she cites many cases [3] in support of the rule:

"There is a duty to give notice or warning of the dangerous qualities of the article, especially where there is a representation that the prod-

---

appreciable amount of dust on a person's skin and the person perspired moderately that he would expect a saturate solution of the material to enter the eyes. Because of the property of the detergent of lowering the surface tension and wetting the surface to a much greater extent than normal, that the solution would pass more freely through the eyebrows and into the eyes than in normal perspiration. Dr. Emerson further testified that a saturate solution forming in perspiration on a person's face and running into the eyes which contained a product containing 33% sodium lauryl sulphate would probably cause the person to lose their sight altogether.

Dr. Walter C. Spencer, one of the physicians who attended appellant, both after the occurrence on October 2nd and also after the occurrence on October 16th and throughout the long period of time thereafter before she completely lost her sight, testified that in his opinion the sodium lauryl sulphate contained in the Dreft used by appellant on the occasions in question was the cause of the burns and ulcers found on the cornea of appellant. Dr. Spencer found nothing other than the Dreft which could have been a cause of her condition. He also testified a solution made from Dreft containing 33 1/3% sodium lauryl sulphate would cause ulceration to the cornea and associated chemical conjunctivitis.

In 1944, there was published in the American Archives of Ophthalmology a publication vouched for by the American Medical Association setting forth the effects of detergents on the cornea of the eye, based upon experiments on rabbit eyes made by Dr. Leopold of Philadelphia. In 1944 there was also published in the Journal of Pharmacology & Experimental Therapeutics, an article by J. H. Draize setting forth standard tests for determining the toxicity to the eye mucosa of preparations containing surface active agent.

Dr. John Stough, a witness for appellant, was also one of appellant's attending physicians following the injury to her eyes. He testified in part as follows:

"Q. Dr. Stough, what are the chemicals in detergents that would be likely to cause severe damage to the human eye? A. One of the primary ones is sodium lauryl sulphate."

And further:

"One of the substances in detergents is sodium lauryl sulphate which has been found by experimentation, experimental studies, that in concentrations of 20% or more will seriously damage the eye."

Dr. Stough further testified that in his opinion that the Dreft solution which appellant got into her eyes was the cause of the condition of the eyes which he found and of her blindness.

Dr. Thomas Royce, who had never seen or treated the appellant, was the only medical witness produced by appellees. A hypothetical question embodying substantially the facts in evidence was asked him and he testified that he couldn't make a diagnosis of the case based thereon.

3. Armstrong Packing Co. v. Clem, Tex. Civ.App., 151 S.W. 576; Coleman Co. Inc. v. Gray, 10 Cir., 192 F.2d 265; Farley v. Edward E. Tower & Co., 271 Mass. 230, 171 N.E. 639, 86 A.L.R. 941; Hopkins v. E. I. Du Pont De Nemours & Co., 3 Cir., 199 F.2d 930; Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449; Standard Oil Co. v. Lyons, 8 Cir., 130 F.2d 965.

uct is not dangerous, and, where such notice or warning is not given, the manufacturer or seller is liable for an injury arising from a use which should have been contemplated, at least where the manufacturer or seller failing to give notice has knowledge of the dangerous qualities. If the article is dangerous to human life if improperly used, the manufacturer and distributor must apprise the public by labels or otherwise of the manner in which the article may be safely used."

Among the cases cited are Armstrong Packing Co. v. Clem, Tex.Civ.App., 151 S.W. 576, a Texas case, dealing with soap containing a poisonous ingredient as to which no warning had been given, and cases dealing with inflammable combs, poisonous eyebrow and eyelash dye, dangerously explosive water proofing compounds and various other products, containing harmful and deleterious ingredients, in which said products have been held to have been negligently manufactured or put out without adequate warning.

Appellees, on their part, pointing out that the advertisement of Dreft in which the defendant stated that the detergent was safe if it got into the human eye, was put out in 1942, many years before this occurrence, and further that plaintiff had never seen or heard of the article, insists that taken as a whole the article merely states in effect, that such Dreft as might get into the eye in normal use is not harmful and that this statement is supported by the undisputed evidence that defendant's employees handling Dreft in large quantities do not use goggles or any other eye protection, and though the room in which they work is vapor filled with Dreft particles, none of them have ever received any injury, and that though literally millions of packages have been distributed, no other claim of injury from Dreft has ever been made. So pointing, they insist that there is no basis in this case for a claim that there has been any breach of warranties.

They further point to the testimony of plaintiff that she knew that Dreft was not intended for use in the eyes and would burn if allowed to get in them,[4] and that while working in the laboratory at the time she claims that her eyes were injured, she was never conscious of Dreft being in her eyes on either of the two occasions, although she did say that she was conscious of its being in the sweat on her face and some of it running into the corners of her mouth.

To the claim of negligence appellees answer that the undisputed testimony of Dr. Nicholas, Associate Professor of Chemistry at Rice, is that he had analyzed a sample from the particular box which plaintiff used in her activities in the laboratory on the second occasion complained of, and found no foreign, dangerous, or deleterious substance in the product and concluded that it was a mild detergent with about the same irritative qualities as Palmolive, Ivory, or Camay soap, and would cause only mild irritation to the human eye. As to the testimony of plaintiff's witness that blindness had resulted from their putting in a rabbit's eye a Dreft solution, appellees argue that the experiment is not in point because it is not shown how the amount put into the rabbit's eye compared with that which they

---

**4.** "Q. Now, you knew, and you have always known, haven't you, Miss Hardy, that no soap is supposed to be put in your eyes; don't you? A. Yes, sir.

"Q. That any soap put in your eyes will burn? You knew that; didn't you? A. Yes.

"Q. You had never read any directions on the box that this Dreft was in that it was supposed to be put in your eyes or it could safely be put in your eyes; did you? A. I didn't read that it could or could not. I read the directions.

"Q. At the time you went to see Dr. Spencer following the first occasion, which was on Monday morning, you did not give him a history of having gotten any Dreft in your eyes, did you? A. No.

"Q. And if you had gotten any Dreft in your eyes·on the first occasion, you didn't know it and weren't conscious of it, is that right? A. Yes."

claimed got into plaintiff's eyes and further appellees oppose to the rabbit experiments the undisputed evidence of experiments conducted by placing in the eyes of two persons, who had volunteered themselves for experiment, precisely the same quantities that are in Dreft without any injurious results. They also point to the undisputed fact that plaintiff was allergic to certain substances and had had some eye trouble before, and to the testimony that the use by the doctors of pontocaine and other alleviates could, acting with her allergy, have caused the result. On the whole case they take the position that our case of Sawyer v. Pine Oil Sales Co., 5 Cir., 155 F.2d 855 controls. In that case, plaintiff sued for injuries to her eyes as the result of a splashing into them of a cleaning fluid with which she was cleaning a sink. This court held that there was no express warranty against non-injury to the eye nor any warranty implied or otherwise that the cleaning agent was suitable for use in the eye, nor that it would not hurt the eye if put therein, and also that there was no duty owing plaintiff by the defendant to warn plaintiff because the danger of injury from getting the cleaning fluid in the eye was obvious and no one is under an actionable duty to warn another of a fact of which he is already fully aware.

In addition to our case, the appellees cite other cases [5] dealing each on its own facts with the general question involved here.

Appellant, in its counter reply to appellees' position and its cases, urges that this is not a case like the ones on which appellees rely, that it is a case of serious, and not merely painful injuries, and particularly that defendants having stated that it would not hurt the eye if used therein, cannot now be heard to say that the evidence as a whole is not for the jury.

Appellant particularly insists that our Sawyer case is not in point because there the injury from a splashing fluid was plainly obvious, while here it would be a question of fact for the jury whether the injury she received from getting the Dreft in her eye was plainly obvious to her and others. Especially is this so, since, as shown by her testimony she did not know on the first occasion that it had gotten into her eye or that it was in any manner responsible for injuring it, and that she was not conscious that it was getting into her eyes the second time until she finally realized that it must be the Dreft.

Appellees in reply urge that having received a serious and painful injury in the first encounter she was guilty of contributory negligence as a matter of law in repeating the same procedure, and cannot charge the appellees with responsibility for her injury. Finally, appellees urge that, taking the evidence as a whole, there is no sound basis in law for the conclusion that Dreft caused the injury.

■ The case is certainly not one free from doubt, and it does seem to come close to the border line. It seems to us, though, that there is positive testimony as to the deleterious effect on the eye of sodium lauryl sulphate, a chemical constituent of Dreft, which, if believed, would support a verdict that plaintiff's injuries were received from Dreft.

Further, there is testimony from which it might be found: that while she knew that if she got Dreft in her eye she might have a smart or pain, she did not know that the consequences would be serious; that the appellees themselves did at one time advertise the product as safe for use in the eye; and that in March of 1949, before this injury oc-

5. Among others are: Bender v. William Cooper & Nephews, Inc., 323 Ill.App. 96, 55 N.E. 94; Briggs v. National Industries, 92 Cal.App.2d 542, 207 P.2d 110; Cliff v. California Spray-Chemical Co., 83 Cal.App. 424, 257 P. 99; DeVere v. Parten, 222 Minn. 211, 23 N.W.2d 584; Lenz v. Standard Oil Co. of N. Y., 88 N. H. 212, 186 A. 329; Ross v. Porteous, Mitchell & Braun Co., 136 Me. 118, 3 A. 2d 650.

curred, they had changed the formula for the product to make what they called a Milder Dreft.

In view of all these considerations and especially the underlying rule that a case is one for the jury and may not be taken from it by an instruction for defendants unless a finding in favor of the plaintiff would be contrary to right reason, we think it was error to take the case from the jury and instruct the verdict.

This is not to say that we think that the use of Dreft did or did not cause plaintiff's injury, or that a reasonably prudent manufacturer would, or would not, have known or anticipated the dangers attendant upon its use and have given warning thereof. It is to say, though, that on the evidence as a whole the jury could have found for plaintiff or for defendants, and that it was, therefore, error not to submit the case to them for their verdict.

The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.