Nina **MERRILL**, Appellant,

v.

**BEAUTE VUES CORPORATION**, a cor-
poration; and Waval Thermal Com-
pany, a corporation, Appellees.

No. 5249.

United States Court of Appeals
Tenth Circuit.

July 3, 1956.

Rehearing Denied Sept. 11, 1956.

Andy Wilcoxen and Edwin Langley, Muskogee, Okl. (Norman & Wheeler and Joe Cannon, Muskogee, Okl., on the brief), for appellant.

T. L. Gibson and Julian B. Fite, Muskogee, Okl. (John M. Gephart, Wagoner, Okl., on the brief), for appellees.

Before MURRAH and PICKETT, Circuit Judges, and HILL, District Judge.

PICKETT, Circuit Judge.

The plaintiff, Nina Merrill, purchased a package of Nutri-Tonic permanent, a hair waving product, manufactured by the defendant Waval Thermal Company, a corporation, and marketed by the defendant Beaute Vues Corporation, a corporation. The product is a solution containing ammonium thioglycolate, a substance which softens human hair so that it can be shaped, and is similar to the many brands presently on the market. It is used to curl and beautify women's hair and is commonly known as "home permanent". Defendants' product was applied to plaintiff's hair according to directions. Within a short time thereafter she became quite ill, her eyes and face were swollen, large hives appeared on her body, she felt nauseated, and her vision became blurred. Her vision remained impaired. This action was brought by plaintiff, alleging that her injuries were caused by the product which contained ammonium thioglycolate acid, a substance dangerous and injurious to the health of those who used it, which was known, or should have been known, to the defendants.

After denying defendants' motion for a directed verdict, the court submitted special interrogatories to the jury, as provided by Rule 49(a), Fed.Rules Civ. Proc. 28 U.S.C.A., which were answered in favor of the plaintiff.[1] Thereafter the court sustained defendants' motion for judgment notwithstanding the verdict on the ground that there was insufficient evidence to sustain the jury's answer to Interrogatories Nos. 2 and 3. The court made additional findings to the effect that even if plaintiff was injured by the use of defendants' product, she was not a member of a class expected to be affected by the use of the product and her injury constituted an isolated instance of injury to an unusually susceptible individual. The court also found that the evidence failed to show that the defendants' product is harmful to any class or group of individuals when used for the purposes intended. The court further found that the evidence failed to show that the defendants knew, or in the exercise of reasonable care should have known, that their product would be injurious or harmful to normal persons or to any class of persons, or to plaintiff. This appeal is from a judgment entered in favor of the defendants.

1. The interrogatories submitted to the jury, together with the answers, are as follows:

"Interrogatory No. 1. Do you find from a preponderance of the evidence that the plaintiff was injured as a direct and proximate result of using the defendants' product, as complained of by her at this time?

"Answer Yes or No. Yes.

"Interrogatory No. 2. Do you find from a preponderance of the evidence that the substance contained in the defendants' product, known as Ammonium Thioglycolate, is dangerous and injurious to the health of those who use it?

"Answer Yes or No. Yes.

"Interrogatory No. 3. Did the defendants have knowledge of the dangerous and injurious qualities of the product sold, or should they have had such knowledge in the exercise of due care?

"Answer Yes or No. Yes.

"Interrogatory No. 4. What sum of money do you find under the evidence would adequately compensate plaintiff for her damages as a result of her injuries?

"Amount $45,000.00."

The plaintiff contends that the case was brought and tried upon the allegation that defendants' product contained an ingredient known as ammonium thioglycolate acid which was inherently dangerous and injurious to the health of anyone who used it; that this is not an allergy case or one involving unusual sensitivities and that the evidence is sufficient to sustain the jury's answer to Interrogatory No. 2.

■ The law is that one who sells and delivers to another an article or product containing poison or deleterious ingredients which are intrinsically dangerous to human life or health, is responsible to any person who, without fault, is injured thereby. American Cyanamid Co. v. Fields, 4 Cir., 204 F.2d 151; Hardy v. Proctor & Gamble Mfg. Co., 5 Cir., 209 F.2d 124; Bianchi v. Denholm & McKay Co., 302 Mass. 469, 19 N.E.2d 697, 121 A.L.R. 460; Zirpola v. Adam Hat Stores, Inc., 122 N.J.L. 21, 4 A.2d 73. We have examined the record and are of the view that the evidence is insufficient to permit recovery under this rule.

There was evidence of injury to plaintiff's optic nerve. The attending physician testified that in his opinion the use of defendants' product caused plaintiff's illness and permanent injury to the optic nerve, resulting in impaired vision. He did not testify that the product was inherently poisonous, dangerous, or likely to injure anyone who used it. Plaintiff sought to supply this evidence by introducing two medical articles on the subject, one written in 1946 by Dr. Lawrence H. Cotter, and published in the journal of the American Medical Association, and the other written by Drs. John T. Robson and Walter Cameron and published in Northwestern Medicine, a publication of limited circulation, in 1949. The article of Dr. Cotter was published shortly after the cold wave solutions were placed on the market for home consumption. He expressed the opinion that the product caused a toxic reaction which would in-

crease as the use was extended, and applied by unskilled hands. He cited five cases of persons having reactions after being exposed to the product. None of these cases involved injury to the optic nerve and no reference was made to optic neuritis. He concluded that, as shown by the five cases, ammonium thioglycolate acid can cause severe allergic reactions in sensitive persons, also that "like other allergens, its main impact is on the skin and mucous membranes. The effect is cumulative, and sufferers have remissions after contact with the acid has been removed. The process had been applied to many thousands without ill effects, but it seems probable that repeated exposures may eventually prove disastrous to those who have been immune up to the present time. It is not possible to determine in advance, without patch tests, which individuals will suffer toxic reactions. In general, those with anemias and allergic disturbances were the most vulnerable. There is some evidence of group sensitivity having been developed in persons who had a violent response to the first application of thioglycolate acid by previous use of certain depilatories containing an HS radical." We think that a careful reading of this article discloses that its purpose was to call attention to the possible injurious effects of the cold wave product when use is increased by advertising, lower prices, and applied by unskilled operators. Although statements were made in the article to the general effects of the product upon users, it was essentially a projection into the future of what might happen, and dealt primarily with allergic reactions. Dr. Cotter does say that liver damage may be anticipated in any individual from repeated exposure.

The Robson and Cameron article was a report of two cases, a mother and daughter, in which each suffered optic neuritis after using a home permanent containing ammonium thioglycolate, resulting in permanent injury to the vision.[2] At the time the article was writ-

2. "Optic neuritis" is described as inflammation and swelling of the optic nerve.

This article did not say that the writers were of the opinion that ammonium

ten, it was estimated that approximately 55,000,000 packaged permanent waves were sold annually. The defendants were familiar with Dr. Cotter's article, but did not learn of the one written by Drs. Robson and Cameron until after this action was brought.

The undisputed evidence discloses that the concern of Dr. Cotter, including damage to the liver, was not justified. Following the publication of his article, the industry conducted extensive research, using human subjects for experiment, and found that the use of the product resulted in no evidence of systemic poisoning and was safe for general use. The report of this investigation was published in the journal of the American Medical Association. The Food and Drug Administration of the United States, Department of Health, Education and Welfare, investigated these products and, based upon "rigorous laboratory evaluation of the hazards involved", concluded that the judicious use of ammonium thioglycolate as a hair waving preparation would prove a relative innocuous procedure and that allergic responses would occur only rarely. The Committee on Cosmetics of the American Medical Association published this report in the November 18, 1949 issue of the journal of the American Medical Association as the report of that Committee. In addition the defendants examined into the possibility of injurious effects of the product upon users, making many tests on individuals, including those who were working with the product. It was applied to thousands in demonstrations, with no reported ill effects.

At the time of trial, the defendants have sold over thirteen million five hundred thousand packages without any report of injurious effects except those having allergic reactions, and in some instances, injury to the hair. The industry at large, all of which use ammonium thioglycolate in their product, had sold over five hundred million packages. With one possible exception, the only evidence of injuries to the optic nerve are those mentioned by Drs. Robson and Cameron, and the plaintiff. The plaintiff assumes that ammonium thioglycolate is poisonous from the fact that it caused injury to her optic nerve, but this does not follow. Many serious injuries result from reactions due to physiological idiosyncrasies. There was no proof of any systemic poisoning to a user after the Cotter article.

 Fully recognizing the rule that the verdict of the jury must stand unless the evidence is so conclusive that the minds of reasonable men could not differ in the conclusions to be drawn therefrom, we think that this undisputed evidence so completely dissipates the fears expressed in the Cotter article that to hold there was sufficient evidence to create an issue of fact on this question would be a failure to recognize realities. The law requires a person to reasonably guard against probabilities, not possibilities. Oklahoma Gas & Electric Co. v. Wilson, 172 Okl. 540, 45 P.2d 750. Whether Dr. Cotter would have the same opinions and fears now that he did almost ten years ago, we do not know for he was not called as a witness. If this product is inherently dangerous and injurious to the millions who now use it, surely some qualified witness would have been present to so testify and reliance on a magazine article published almost ten years before to establish that fact would not have been necessary.

 This brings us to the question on the findings made by the court, and the sufficiency of the evidence to sustain them. Rule 49(a), 28 U.S.C.A.[3] permits

---

thioglycolate in the cold wave preparation was inherently dangerous.

3. Rule 49(a) provides:
 "(a) Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written

finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence;

the court to require a jury to return specific verdicts upon each issue of fact. These questions are to be submitted to the jury in written form, susceptible of brief answers. If in submitting these questions the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issues so omitted unless before the jury retires, he demands its submission to the jury. In case an issue of fact is omitted without such demand, the court may make a finding. After receipt of suggested interrogatories, the court submitted the four set forth in footnote one. The record does not disclose that the plaintiff objected to the form of the interrogatories or made demand that any other issue of fact be submitted. This constitutes a waiver of the right to a trial by jury on any omitted issue, and the court may then make findings. Columbia Horse & Mule Commission Co. v. American Ins. Co., 6 Cir., 173 F.2d 773; A. M. Webb & Co. v. Robert P. Miller Co., D.C.E.D.Pa., 78 F. Supp. 24, reversed on other grounds, 3 Cir., 176 F.2d 678.

Although there was no direct evidence tending to show that the plaintiff was allergic to defendants' product or that her injury constituted an isolated injury to an unusually susceptible individual, the undisputed evidence is that with the exception of two cases referred to in the Robson-Cameron article, the injury to plaintiff's optic nerve is the only one reported out of five hundred million users of the product. This in itself is sufficient to sustain the court's finding on this subject. We are satisfied that considering all the facts and circumstances the issue was raised and the findings necessary. We therefore have the question as to whether a manufacturer who places a product on the market, knowing that some unknown few, not in an identifiable class which could be effectively warned, may suffer allergic reactions or other isolated injuries not common to the ordinary or normal person, must respond in damages. Although there is authority to the contrary, we think the prevailing and better rule is that the injured persons in such cases cannot prevail. The reason generally given for the rule is that the injury is caused by allergy or the unusual susceptibility of the person and not the product. The essence of these decisions is that a reasonable person could not foresee the purchaser's condition and could not anticipate the harmful consequences.[4] In the case at bar, as in similar cases, the plaintiff herself did not know that a usually harmless product could cause injury to her optic nerve. Until after the filing of the complaint, the defendants had no knowledge of like injuries to others, and then only two were reported. Under the circumstances, a warning would have been wholly ineffective. Bennett v. Pilot Products Co., 120 Utah 474, 235 P.2d 525, 527, 26 A.L.R.2d 958, and Briggs v. National Industries, 92 Cal.App.2d 542, 207 P.2d 110, are cases dealing with cold wave products contain-

---

or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

4. In Cleveland v. Stanley, 155 Okl. 272, 9 P.2d 10, 11, the court quoted from Chicago, R. I. & P. Ry. Co. v. Nagle, 55 Okl. 235, 154 P. 667, 668, as follows:

" * * * 'The test of whether an act was the remote or proximate cause of the injury complained of is whether the injury was one to be anticipated.' And: 'In order that an act of negligence may be deemed the proximate cause of an injury, it must be such that a person of ordinary intelligence would have foreseen that the injury was liable to be produced in the act.' * * * *"

ing ammonium thioglycolate. In each case the plaintiff suffered reactions, other than optic neuritis, from coming into contact with the product, and in each case it was held that there was no liability on the part of the manufacturer. The Utah court, in referring to the cases relied upon by plaintiff, said:

"So far as they sanction recovery by an unanticipated few whose sensitivities or allergies are not reasonably foreseeable, we cannot accept them. Rather we must adhere to the philosophy enunciated by the cases reflected in respondent's citations and which was put so aptly by Dean Prosser in his work on Torts, p. 679, to the effect that: 'The manufacturer is at least entitled to assume that the chattel will be put to a normal use by a normal user, and is not subject to liability where it would ordinarily be safe, but injury results from some unusual use or some personal idiosyncracy of the consumer.' Citing Walstrom Optical Co. v. Miller, Tex.Civ.App., 1933, 59 S.W. 2d 895."

Cases on the subject are collected in an annotation in 121 A.L.R. 464, and 26 A.L. R.2d 963.

 Neither do we think that the defendants are liable to plaintiff on an implied or express warranty. Warranties do not extend to injuries caused by peculiar idiosyncrasies or physical condition of a user which are not reasonably foreseeable. The rule as to negligence in such cases applies to warranties. Worley v. Proctor & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532; Barrett v. S. S. Kresge Co., 144 Pa.Super. 516, 19 A.2d 502; Stanton v. Sears Roebuck & Co., 312 Ill.App. 496, 38 N.E.2d 801; Zager v. F. W. Woolworth Co., 30 Cal.App.2d 324, 86 P.2d 389; and cases collected in 26 A.L.R.2d 966.

Affirmed.

MURRAH, Circuit Judge (concurring specially).

I quite agree that the evidence is insufficient to show that the appellee's product is injurious to the normal person who uses it for its intended purposes. And, the appellant's positive and specific denial that her injuries resulted from her unusual susceptibility to ammonium thioglycolate, leaves me without tenable basis for the advancement of my thesis that the appellee, having knowledge of the injurious effect of ammonium thioglycolate to the unusually susceptible or allergic, owes such persons a duty to appropriately warn of the potential dangers in the absence of which he is liable either in warranty or tort.

The trial court's judgment *n. o. v.* is based squarely on the conclusion that the appellant was an "unusually susceptible individual * * * not a member of a class expected to be affected by the use of the product." If I could agree with this conclusion, I should have no difficulty agreeing to the opinion of the court, for I freely concede that the rule of law should not be extended to protect one isolated individual out of literally millions who use the product without harmful consequences. And this is so whether we approach the problem of liability subjectively through what to me is the erroneous theory of probable cause or foreseeability; or what to me is the correct objective inquiry, whether the rule of law ought to extend protection to the allergic or unusually susceptible by the imposition of a duty to warn of known potential dangers. To borrow the words of Mr. Justice Wade specially concurring in Bennett v. Pilot Products Co., 120 Utah 474, 235 P.2d 525, 528, 26 A.L.R.2d 958, 962, "Whether the producer of a product owes its allergic customers a duty to warn them against its possible ill effects is * * * [a] question which has nothing to do with reasonable anticipation or foreseeability and to confuse these two concepts does not add to clarity." See also Green, Rationale of Proximate Cause, § 3, p. 11.

From the evidence in this case, the jury might well have found that the am-

monium thioglycolate contained in this cold wave solution is harmful to a small percentage of persons when used initially or cumulatively for its intended purposes. Indeed, the medical reports of record show a number of case histories of harmful results to the users of cold wave solutions containing six percent or more of ammonium thioglycolate. And, there are at least two adjudicated cases involving the manufacturer's liability to unusually susceptible users of a product containing this and kindred ingredients. Bennett v. Pilot Products Co., supra; Briggs v. National Industries, 92 Cal. App.2d 542, 207 P.2d 110. In those cases, liability was denied as a matter of law, based upon the insufficiency of the evidence to show any reasonable foreseeability of harm to the individual plaintiff. Knowledge, either actual or constructive, was said to be the touchstone of liability, and the manufacturer was not legally charged with knowledge that the normal use of his product would injuriously affect any legally cognizable number of persons.

Other courts have denied liability of the manufacturer for harmful consequences from the use of his product on the factual premise that the injury was due to the "buyer's individual idiosyncrasy", Barrett v. S. S. Kresge Co., 144 Pa.Super. 516, 19 A.2d 502, 503; or constitutional peculiarities. See Flynn v. Bedell Co., 242 Mass. 450, 136 N.E. 252, 27 A.L.R. 1504; Zager v. F. W. Woolworth Co., 30 Cal.App.2d 324, 86 P.2d 389. The rationale of these cases has led to what now seems to be the weight of authority to the effect that a manufacturer of a product owes no legal duty, either in warranty or tort, to the allergic plaintiff. See cases collected Annotations, 121 A.L.R. 464; 26 A.L.R.2d 963.

But where the proof shows that "some", or even a "small proportion", will be injuriously affected by the use of a manufacturer's product, some courts have recognized the duty to warn of the known or imputed dangers at the risk of liability. See Bianchi v. Denholm & McKay Co., 302 Mass. 469, 19 N.E.2d 697,

121 A.L.R. 460; Zirpola v. Adam Hat Stores, 122 N.J.L. 21, 4 A.2d 73; Reynolds v. Sun Ray Drug Co., 135 N.J.L. 475, 52 A.2d 666.

The difficulty lies in the failure of the law to recognize the allergic or unusually susceptible plaintiff as a class of people to whom a manufacturer owes a legal duty to warn of potential dangers. Once the allergic plaintiff is recognized as one of a class of "some" people, the consequent legal duty becomes too plain for doubt. Science and medicine have now recognized the allergic and hyper-sensitive as a definite class of people, presenting physiological and biochemical problems arising out of the use of and contact with the products of advanced chemistry. See Cooke, Allergy in Theory and Practice; Feinberg, Allergy in Practice. If the law is to keep apace of the socialistic problems wrought by science and technology, it is high time for the courts to also recognize the allergic or unusually susceptible as members of a legally identifiable class, to whom the law will extend its protection in warranty and in tort, and not as isolated individuals of whom the law takes no account. See Allergy of the Plaintiff as a Defense in Actions Based Upon Breach of Implied Warranty of Quality, 24 So.Calif.Law Rev. 221, April 1, 1951; Negligence—Liability of Manufacturer or Vendor to an Allergic Consumer, 49 Mich.Law Rev. 253.

Even before allergies were recognized in science as a definite class, some of the courts were saying that "When the fact is once established and demonstrated by experience that a certain commodity apparently harmless contains concealed dangers, and when distributed to the public through the channels of trade and used for the purposes for which it was made and sold is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge to the extent, at least, of warning the ignorant consumer or user of the

existence of the hidden danger." Gerkin v. Brown & Sehler Co., 177 Mich. 45, 143 N.W. 48, 53, 48 L.R.A.,N.S., 224. See also *Arnold v. May Department Stores*, 337 Mo. 727, 85 S.W.2d 748.

I would apply that rule to our facts and submit to the jury the questions: (1) whether from the evidence, the plaintiff was unusually susceptible to some of the ingredients of the seller's product; (2) if so, did the allergic plaintiff know of her unusual susceptibility; (3) if not, did the manufacturer know or have reason to know that some of the ingredients of its product were harmful to the unusually susceptible; and (4) if so, did it appropriately warn of such potential dangers. Since, however, the case was neither tried nor presented on that theory, I must be content to concur in the result.