[No. 16200.  Department One.  November 22, 1921.]

UNITED STATES CAST IRON PIPE AND FOUNDRY COMPANY, *Respondent*, v. L. R. ELLIS *et al., Appellants.*[1]

SALES (105)—IMPLIED WARRANTY—SUITABILITY FOR PURPOSE—CONTRACT—PERFORMANCE.  When an article is manufactured for a buyer in accordance with designated specifications, or an article of a standard kind, well known to the trade, is ordered, there is no implied warranty of reasonable fitness for the intended purpose, even though the seller knows the purpose for which it is intended and it afterwards prove unsuitable therefor.

SAME (127, 133)—REMEDIES OF SELLER—ACTION FOR PRICE—DEFENSES — DEFECT IN GOODS SOLD — EVIDENCE—SUFFICIENCY.  In an action to enforce a materialman's lien for cast iron water pipe furnished a public contractor, the latter is not entitled to set off the expense of replacing joints of pipe which broke after being put in place, where the evidence was not sufficient to justify the conclusion the pipe broke because of defects in manufacture, but rather raised an inference that the breaking was due to method of installation on the steel cross beams supporting it.

Appeal from a judgment of the superior court for King county, Frater, J., entered May 6, 1920, upon findings in favor of the plaintiff, in an action to enforce a materialman's lien, tried to the court.  Affirmed.

*Kerr & McCord* and *Stephen V. Carey*, for appellants.

*Bogle, Merritt & Bogle*, for respondent.

[1]Reported in 201 Pac. 900.

FULLERTON, J.—By the record in this cause, it is disclosed that the city of Seattle entered into a contract with the appellant Ellis, by the terms of which the appellant agreed to furnish the necessary piping and install for the city two certain water mains through a concrete tunnel which the city had theretofore caused to be constructed. The tunnel was some nine hundred feet in length, was circular in form, and about twelve feet in diameter. It was designed to carry mains in addition to those the appellant was required by his contract to install, and one of these, a water main forty-two inches in diameter, had then been laid on the floor of the tunnel. Above this main, steel "I-beams" had been inserted across the tunnel eight feet apart, and it was on these beams that the appellant was required to lay the mains which he undertook to install. The plans and specifications accompanying the contract prescribed the character of the work with particularity. One of the mains was to be constructed from joints of pipe twenty-four inches in diameter of a kind known as "class D. flanged cast iron pipe with plain, straight flanges," to be bolted together in a described manner, and was required to withstand when in place a water pressure of two hundred and twenty-five pounds per square inch.

The appellant purchased the pipe for the mains from the respondent. When the twenty-four-inch main was laid in the tunnel, some three of the joints of pipe broke on the application of test pressures. These breaks occurred at different tests and were separately replaced. Owing to the cramped space in which the workmen were required to work and the great weight of the joints, the work of replacing a broken joint was exceedingly difficult and costly. The appellant conceived

that the expense of replacing them was an expense for which the respondent was liable by the terms of the contract under which the pipes were purchased, and withheld from the purchase price the cost of the replacement. The respondent disclaimed liability, filed a claim of lien for the unpaid part of the purchase price against the statutory bond given by the appellant to the city, and thereupon instituted the present action to enforce the claim. The appellant sought to set off the expense he had incurred in replacing the broken joints of pipe, and on the issue of the respondent's liability for the expense so incurred, the cause was tried by the court sitting without a jury. The trial court disallowed the set-off, and entered a judgment in favor of the respondent.

The contract between the appellant and respondent is evidenced by certain telegrams and letters passing between appellant and the respondent's agent. Preparatory to bidding on the work, the appellant interviewed the agent and ascertained from him the cost at which his company could furnish the required pipe, exhibiting to the agent at that time the plans and specifications the city had prepared for the work. Later on, and after the appellant had been awarded the contract for the work, he sent to the agent a telegram ordering, with other sized pipe, "eighty-three joints twenty-four-inch flanged D" pipe, confirming the order a few days thereafter by a letter in which he gave shipping directions, and in which he stated that the pipe was "to fill the specifications of the city of Seattle for the service mains and accessories of the Lake Union tunnel." In due time the pipe was furnished by the respondent and, after inspection and such tests as could then be applied by the appellant, was installed in the pipe line. On turning on the

water after the pipe had been installed, a joint of the pipe broke when the pressure of the water reached some twenty-five pounds to the square inch. This joint was taken out and replaced by another, and the water again applied, when another joint broke at about the same pressure. This was likewise replaced and the water again applied, when another joint gave way at a somewhat increased pressure, although at a pressure much less than the pipe was required to withstand under ordinary working conditions, and, of course, at a pressure much less than the appellant guaranteed with the city that the pipe would withstand when in place.

As to the cause of the breaking of the pipe the trial court made no specific finding. It did, however, make the following findings:

"That the 24-inch cast-iron flange pipe mentioned in said telegram of defendant Ellis, which is set forth in paragraph VIII of these findings, also in said answer thereto of plaintiff, which is set forth in paragraph IX of these findings, also in said letter of defendant Ellis, which is set forth in paragraph XI of these findings and designated as Class D, was and is a standard well known and definite kind and class of cast-iron flange pipe, which was manufactured by plaintiff and by other manufacturers of cast-iron pipe, according to standard specifications for such manufacture, and the same was so designated as Class D in order to identify such pipe as being such known, described and definite article. That defendant Ellis in ordering such pipe, intended to order, and plaintiff in agreeing to fill such order, intended to supply said 83 lengths of such known, described and definite pipe.

"That no one of the said three pipes broke because of the water pressure to which it was so subjected, nor did any one of said pipes show any sign or evidence of any defect in any particular whatever. That the breaks in said pipes were each circumferential and not such as would be made by internal water pressure,

nor such as would result from said pipes being defective or too poorly made to withstand the pressure and strains which the same were expected and intended to be subjected to. That pieces were cut from two of said broken pipes, at both sides of the breaks therein, and such pieces were subjected to tensile strain tests, and each thereof tested above the requirements for material in such pipes. That each of said pipes was measured and found to be of the proper thickness.

"The court finds that none of the pipe so sold by plaintiff to defendant Ellis, on account of which said defendant claims damages against plaintiff in this action, showed any deficiency in size, thickness, quality of material, insufficiency in construction, or to any defect whatsoever, and that defendant Ellis has wholly failed to establish by the evidence in this case that any such pipe was in any manner defective or that any loss or damage sustained by him was due to or caused by any breach of plaintiff's contract with him for the sale of said pipe; and defendant Ellis wholly failed to sustain either of his affirmative defenses herein, except as to the payments for freight and gaskets credited to him as aforesaid."

As grounds for reversal of the judgment entered, the appellant makes two principal contentions; first, that in the contract under which the piping was purchased there was an implied warranty of fitness for purpose; and second, that the evidence preponderates in favor of the conclusion that the pipes were defective because of faults in their manufacture.

Noticing the first of the contentions, this court has held, and it is perhaps the general rule, that where a buyer orders a specific article from a dealer or manufacturer, stating the purpose for which the article is intended to be used, and trusts to the judgment of the seller the selection of the article which shall be suitable for the intended purpose, there is an implied warranty that the article furnished shall be reasonably fit

for the intended purpose. See *Hausken v. Hodson-Feenaughty Co.,* 109 Wash. 606, 187 Pac. 319. But the converse of the proposition is equally the rule, namely, that when the article ordered is to be manufactured according to certain prescribed specifications, or is an article well known and defined in current trade, the contract is complied with when an article is furnished which is manufactured in accordance with the designated specifications, or is an article of the standard kind known to the trade, even though the seller may know the purposes for which it is intended to be used and it afterwards proves to be unfit or unsuitable for the intended purpose. *Caldwell Bros. & Co. v. Coast Coal Co.,* 58 Wash. 461, 108 Pac. 1075; *Mianus Motor Works v. Vollans,* 83 Wash. 680, 145 Pac. 997.

It seems to us clear that the contract falls within the last rather than within the first of these rules. The order was for a stated number of joints of pipe of a kind, as the evidence disclosed and as the court found, well known in current trade by the name by which it was described. The respondent was given no right of selection. It was not permitted to question the fitness of the pipe for the purpose intended. If it filled the order at all, it was bound to furnish standard pipe of the designated kind. Plainly, we think, there could be no warranty of fitness for purpose. To so hold would be to hold that the respondent, by selling the pipe, impliedly warranted the sufficiency of the city's plans and specifications for the construction of the main.

On the second contention, we agree with the trial court that the evidence was not sufficient to justify the conclusion that the joints of pipe which broke, broke because of defects in their manufacture. On this question there was little or no direct evidence of defect in the pipes themselves. The conclusion is drawn largely from the fact that the pipes burst under

such a slight hydraulic pressure, a pressure which an engineer testifying for the appellant stated was "about what an ordinary tin can would withstand." But the nature of the breaks—the fact that they were circumferential rather than longitudinal, and the fact that they broke under such a slight pressure—seems to us to indicate that the predominating strain which caused the breaks was something other than the pressure of the water. Concerning the effect of the water pressure, one of the appellant's principal witnesses testified that a hydraulic pressure of twenty-five pounds to the square inch "would have no noticeable effect on the pipe, . . . ordinarily I would not expect such a pipe to break solely from a hydrostatic pressure of twenty-five pounds, and would feel that if it did break there might be other contributing causes." What the other contributing causes were we think the evidence plainly indicates. The pipe forming the main was of cast iron, having little or no flexibility. It was rigidly bolted together, leaving no flexibility at the joints. The beams upon which it was laid did not form a straight line, but a line with a slight vertical curve. The consensus of the testimony of the engineers is that such a mode of installation for this character of pipe was not in accord with scientific engineering, as it engendered strains which piping of this sort was not contemplated to withstand. The appellant himself testified: (We quote from the abstract.)

"The test that was made of a part of the line before it was connected up was at the suggestion of Mr. Martindale, a representative of the plaintiff. We tested the north end of the line at his suggestion; we put a flange at the break in the tunnel and then tested the north end separately to 225 to 230 pounds, and it stood that test without any leaks developing. Then we connected the south end and tested in the same

way, and it stood the test. . . . Mr. Martindale's position was something to the effect that the cause of the break was the non-flexibility of the line; that that being bolted absolutely solid was the reason for the pipe breaking. That was his position and was why he asked to test the separate ends before they were joined up solidly. We made that test and it proved satisfactory. Afterwards, when the .pipe was connected up, it broke. again, after I was out of there. I believe it was Mr. Martindale's contention that the reason of the three breaks was that the pipe had all been joined together so it was practically inflexible. I don't remember that he said that in his opinion if we did bolt it up again without lead sleeves to give it flexibility it would break again. I don't remember of him expressing any such opinion.

· "Mr. Martindale was there about August eighth or ninth, right after the third break, and went down into the tunnel and saw the line and talked over the matter. He suggested the inflexibility of the line as the possible cause of the break, but he was, I think, as much puzzled as anybody else. His statement and conclusion was that the test he suggested would eliminate the possibility of outside causes. I don't remember that he made the statement that if it was joined up again without giving it flexibility it would break again. I would not say he did not make such a statement.

"At that time we sawed out a piece of the broken pipe for Mr. Martindale to take away and have a tensile test made. The tensile test showed, I·think, the requirements for that class of pipe. They were all considered good tests. So far as those tests showed, the material of which the pipe was made was good material."

We think it unprofitable to pursue the inquiry further. In our opinion, the evidence sustains the conclusion of the trial court. The judgment will stand affirmed.

PARKER, C. J., BRIDGES, MACKINTOSH, and HOLCOMB, JJ., concur.