[No. 3245-1.    Division One.    December 29, 1976.]

LEWIS AND SIMS, INC., *Respondent*, v. KEY INDUSTRIES, INC., ET AL, *Appellants*.

*Robbins, Merrick & Kraft, Burton S. Robbins, Thomas J. Kraft, Elvidge, Veblen, Tewell, Bergmann & Taylor, Duane Tewell, Thomas A. St. Pierre, Macbride, Sax & MacIver,* and *James L. Magee,* for appellants.

*Anthony T. Ressa,* for respondent.

SWANSON, J.—Lewis and Sims, Inc., an Alaska corporation, was awarded a subcontract to install a water and sewer system in the town of North Pole, Alaska. As part of the contract Lewis and Sims was required to furnish all the pipe necessary to complete the project.[1] Lewis and Sims

[1] The contract documents and specifications given to Lewis and Sims by the general contractor, Fairbanks-Lundgren, contained the following language dealing with the type of pipe to be used in completing the project:
2.07.02  PIPING
    Piping for water mains connections shall be of the type and materials specified herein, or as approved by the Engineer.

    .    .    .
2.07.03  MATERIALS
    A *Pipe*—
    All piping shall be black steel minimum wall thickness 10 gauge. Exterior and interior shall be lined with coal-tar enamel, coatings

placed an order on January 27, 1972, with Liberty Equipment and Supply Co. (Liberty), a Washington corporation, for a quantity of pipe sufficient to complete the project. The purchase order signed by Harold Sims of Lewis and Sims and given to Liberty recited the size, quantity and the fact that the pipe was to be coal-tar enamel lined:

1,280' of 4″ x 10″ gage x 40' long pipe, *coal tar enamel lined*

11,560' of 6″ x 10″ gage x 40' long pipe, *coal tar enamel lined*

7,880' of 8″ x 10″ gage x 40' long pipe, *coal tar enamel lined*

1,640' of 10″ x 10″ gage x 40' long pipe, *coal tar enamel lined*

400' of 12″ x 10″ gage x 40' long pipe, *coal tar enamel lined.*

(Italics ours.) Finding of fact No. 3. (Note: The finding lists the total number of feet of pipe ordered in item two as 1,560' whereas the purchase order of Lewis and Sims lists the number of feet of pipe ordered as 11,560'.)

On February 2, 1972, Liberty which acted only as a middleman ordered the same pipe from Northwest Pipe and Casing Co. (Northwest), an Oregon corporation engaged in the manufacture of steel pipe. Northwest in turn contracted with Hall Processing Co. (Hall), a Utah corporation with offices in Oregon, for the application of the coal-tar lining to the pipe. Thereafter, the pipe was shipped f.o.b. Clackamas, Oregon, to North Pole, Alaska, and was delivered at the jobsite on March 22 and 23, 1972. Once at the jobsite, the general contractor, Fairbanks-Lundgren, took charge of unloading the steel pipe. This unloading process with its inevitable rough handling of the pipe took place over a period during which the temperature at nearby Fairbanks, Alaska, ranged from a high on March 22, 1972, of +6° F to a low on March 24, 1972, of —27° F.

---

conforming to AWWA [American Water Works Association] C-20[3]. [The original specifications called for AWWA C-204. However, all parties agreed that no such AWWA standard existed for coal-tar enamel lined pipe; rather the specifications should have read AWWA C-203.]

· During the middle of April 1972, Lewis and Sims began laying the pipe for the sewer outfall line. By early May of 1972, some 5,000 feet of pipe had been installed. It was also during the early part of May that Mr. Edwards Stitch commenced his duties as project inspector. His subsequent inspections of the steel pipe revealed that portions of the interior enamel lining had cracked away from the steel outer casing and were hanging down in large sheets. This condition existed throughout the remainder of the pipe except for the pipe already installed. As a consequence, the pipe not already in place was rejected. In order to complete the project, Lewis and Sims ordered replacement pipe from Beall Pipe & Tank Corp., paying $39,861.78 for the pipe and freight.[2]

Suit was commenced by Lewis and Sims against Liberty, Northwest, and Hall to recover for damages it allegedly suffered due to the defective pipe. The trial court, sitting without a jury, after entering findings of fact and conclusions of law, awarded a $64,273.95 judgment to Lewis and Sims against Liberty and Northwest. In reaching its decision, the trial court found that the pipe was intended for a particular purpose—the installation of a sewer and water project at North Pole, Alaska, commencing in the early part of April 1972. Delivery, the trial court reasoned, necessarily required handling in the unloading process. Since the lining could not withstand even the most careful handling due to the unusually cold weather, the trial court found that the pipe was not fit for the particular purpose intended at the time of contracting, as impliedly warranted by RCW 62A.2-315:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is

---

[2]It is interesting to note that the purchase order from Lewis and Sims to Beall recited the former's desire to have coal-tar enamel lined pipe per AWWA C-203. In other words, Lewis and Sims ordered exactly the same kind of pipe from Beall as it did from the defendants herein.

unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Although the appellants present this court with 11 assignments of error, their primary challenge is to the trial court's finding of fact No. 22:

> Liberty and Northwest each breached their implied warranty of fitness to Lewis & Sims. Northwest breached its implied warranty of fitness to Liberty.

In order to invoke the provisions of the section 2-315 warranty, the evidence must be sufficient to show that (1) the seller at the time of contracting had reason to know the particular purpose for which the goods were required, and (2) that the buyer relied upon the seller's skill or judgment in selecting or furnishing suitable goods. *Ringstad v. I. Magnin & Co.*, 39 Wn.2d 923, 239 P.2d 848 (1952); *Burnett v. Hunt*, 5 Wn. App. 385, 486 P.2d 1129 (1971); *Garner v. S & S Livestock Dealers, Inc.*, 248 So. 2d 783 (Miss. 1971); 1 R. Anderson, *Anderson on the Uniform Commercial Code* § 2-315:4 (2d ed. 1970). In marked contrast to other commercial code warranties, it is imperative to the existence of a warranty of fitness for a particular purpose that the buyer relied upon the seller's skill or judgment in selecting the appropriate goods. In so relying, the buyer generally is ignorant of the fitness of the article offered by the seller and thus relies on the superior skill, information or judgment the seller possesses and not on his own judgment.

In *Frisken v. Art Strand Floor Coverings, Inc.*, 47 Wn.2d 587, 288 P.2d 1087 (1955),[3] the owner of a commercial building entered into an agreement with a corporation engaged in the business of selling and laying floor coverings whereby the latter contracted to furnish and install asphalt tile on the floor of the premises. The building's floor was concrete covered with magnesite. The corporation's agent, after viewing the premises, recommended a certain tile suitable for the building owner's needs. The tile, as it

---

[3] This case arose before the enactment of the present-day Uniform Commercial Code; however, the same principles are still applicable.

turned out, was incompatible with the magnesite underflooring such that the tile floor became uneven and buckled. Our Supreme Court held that the seller impliedly warranted that the floor would be fit for the intended use regardless of the structure of the underflooring. In so holding, the court found that the buyer was ignorant of the risk involved in covering magnesite with tile and that she relied on the seller's knowledge and judgment in the matter. *See also Martin v. J.C. Penney Co.*, 50 Wn.2d 560, 313 P.2d 689, 80 A.L.R.2d 697 (1957). *Accord, Catania v. Brown*, 4 Conn. Cir. 344, 231 A.2d 668 (1967); *Handy v. Holland Furnace Co.*, 11 Wis. 2d 151, 105 N.W.2d 299 (1960). In similar fashion, the *Catania* case involved a fairly typical situation where application of the implied warranty of fitness for a particular purpose is deemed appropriate. In *Catania*, the buyer asked the seller, who was engaged in the retail paint business, to recommend a paint to cover the exterior stucco walls of the buyer's house. The seller was told that the stucco was in a chalky or powdery condition. Based on this information, the seller recommended a particular brand name product and also provided instructions on its use. Subsequent to its application, the paint began to flake and blister. The Connecticut Supreme Court found that the implied warranty liability existed since the buyer justifiably relied on the superior information, skill, and judgment of the seller.

If, as has been shown, liability for the implied warranty for fitness for a particular purpose flows from the existence of: (1) reliance by the buyer on the judgment of the seller and (2) the fact that the seller had reason to know of the buyer's particular purpose, *Burnett v. Hunt, supra,* then it conversely follows that no warranty of fitness for a particular purpose arises when it is clear that the buyer orders goods according to his own specifications. As stated in 1 R. Anderson, *Anderson on the Uniform Commercial Code* § 2-315: 21, at 666 (2d ed. 1970),

A buyer does not rely upon the seller's judgment, skill, or experience where an article, although intended for a

disclosed purpose, is to be made or manufactured or furnished by the seller in accordance with plans and specifications furnished by the purchaser; there is in such case no implied warranty that the article, if in accordance with the specifications, will answer the intended purpose, or in other words, no warranty against unfitness arising out of defects in the plans and specifications.

Washington, in adhering to this rule, has stated the proposition in its own terms:

[W]hen the article ordered is to be manufactured according to certain prescribed specifications, or is an article well known and defined in current trade, the contract is complied with when an article is furnished which is manufactured in accordance with the designated specifications, or is an article of the standard kind known to the trade, even though the seller may know the purposes for which it is intended to be used and it afterwards proves to be unfit or unsuitable for the intended purpose.

*United States Cast Iron Pipe & Foundry Co. v. Ellis*, 117 Wash. 601, 606, 201 P. 900 (1921).

We turn now from the abstract legal aspects of the warranty of fitness for purpose to a discussion of that warranty as it applies to the facts before us. In order to prevail in the instant action, the respondent-buyer was under an obligation to show that he relied on the seller's judgment in choosing a pipe that best suited the needs of an underground water-sewer system in North Pole, Alaska. While the trial court apparently believed such reliance existed, we are at a loss to find substantial evidence within the record to sustain the trial court. On the contrary, after carefully reviewing the record, we find ample evidence to conclude that Lewis and Sims ordered a specific size and type of pipe and that any deviation from the coal-tar enamel lined pipe that was manufactured would not have been accepted by Lewis and Sims. In short, neither Liberty nor Northwest was asked for its recommendations, nor did either select the pipe or lining to be used. Liberty merely filled a specific purchase order for pipe—a job it held itself out to do. Moreover, Mr. Sims testified that he knew exactly what he was ordering from Liberty and that it would

not have been within Liberty's province to substitute another type of pipe:

Q  [By Mr. Tewell] All right. Now, when you ordered this pipe and wrote "coal-tar lined pipe" on your order, do you know what I am referring to, do you not?

A  Yes.

Q  At that time, you had already read the specifications which provided that the lining would be pursuant to the AWWA specifications, isn't that right?

A  Yes.

Q  And you intended, when you put down that "coal-tar lined pipe," to ask for precisely the pipe that was set forth in the specifications, did you not?

A  There is an area in there that is vague to me and I really can't give an answer to it one way or another, because as it has been brought up before, those specifications don't ask for AWWA 203 pipe, they ask for AWWA 204 pipe and there is no such thing.

Q  All right. You did read that?

A  Uh-huh.

Q  Isn't that so?

A  Yes.

Q  You believed at the time you read that that it meant some particular pipe though, did you not?

A  Yes.

Q  All right. When you ordered coal-tar lined pipe, you intended to order that pipe that you believed was set forth in the specifications, did you not?

A  Yes.

.  .  .

Q  .  .  .  All right. When you ordered this pipe from Liberty, you did not intend at that time in making that order that they would have the privilege of changing the type of pipe that you were ordering from the kind that was set forth in the specifications?

A  No.

Q  All right. You were relying on the specifications themselves as indicating the kind of pipe precisely that you were going to get and work with on this job, were you not?

A  Yes.

Q  Your answer to that question?

A  Yes.

The warranty for fitness for a particular purpose was not meant to be applied in a situation such as we face today. The central tenet—reliance upon the skill, judgment, or experience of the seller—is not manifested. What is apparent is the fact that both parties to this action knew what was desired, and that desire was fulfilled. It is also important to note that the pipe itself was not negligently manufactured; rather, the lining was susceptible to cracking upon exposure to extreme cold. However, as Mr. Lewis of Lewis and Sims testified, his company was working on a time schedule necessarily requiring delivery of the pipe in late March or early April—a time when, as Mr. Sims testified, the weather in Alaska could be quite variable.

Inasmuch as we find insufficient evidence in the record to support the trial court's finding that Liberty and Northwest each breached its warranty of fitness for purpose to Lewis and Sims, *Ormiston v. Boast*, 68 Wn.2d 548, 413 P.2d 969 (1966), we do not reach appellant Northwest's additional assignments of error. Nor do we find it necessary to undertake a discussion of appellant Liberty's claimed assignments of error in that they are generally directed toward the implied warranty of fitness for purpose issue. However, Liberty does challenge the trial court's finding denying attorney fees to it. Liberty contends that Northwest's failure to provide pipe suitable for the particular purpose required by Lewis and Sims was the proximate cause of Lewis and Sims' resulting damage. Had suitable pipe been provided, the argument continues, there would have been no litigation and Liberty would not have incurred attorney fees. In light of the fact that we have reversed the imposition of liability on the part of Northwest and Liberty to Lewis and Sims, there is no basis for Liberty's contention.

In summary then, we find no breach of an implied warranty of fitness for purpose owed to Lewis and Sims by Northwest or Liberty. Consequently, the award of $64,273.95 is without foundation.[4]

---

[4]The trial court's award of $43,068.48, representing the damages

The judgment is reversed with directions to dismiss the complaint.

FARRIS and ANDERSEN, JJ., concur.

Petition for rehearing denied June 16, 1977.

suffered by Liberty proximately caused by Lewis and Sims' failure to pay for the pipe it ordered was neither briefed nor argued on appeal and thus must be left to stand.